COMMONWEALTH *vs.* JOHN ROUSSEAU.
COMMONWEALTH *vs.* MICHAEL DRESLINSKI.

Worcester. February 7, 2013. - June 5, 2013.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Burning of Property. Malicious Injury to Property. Probable Cause. Search and Seizure,* Affidavit, Probable cause, Warrant, Motor vehicle, Expectation of privacy. *Practice, Criminal,* Affidavit, Warrant, Standing, Probation, Sentence, Instructions to jury, Admissions and confessions. *Evidence,* Relevancy and materiality, Common criminal enterprise. *Global Positioning System Device.*

The owner and operator of a motor vehicle had standing to challenge the sufficiency of a warrant secured by the State police for the purpose of attaching a global positioning system (GPS) device to his vehicle and then tracking its location over a thirty-one-day period, where the police, by their actions, invaded the owner's property and controlled and used it for their own purposes [377-382]; moreover, a passenger in the vehicle also had standing to challenge the warrant, where the passenger had a reasonable expectation that his movements would not be subjected, without judicial oversight and a showing of probable cause, to extended electronic surveillance by the government through use of GPS monitoring [382].

An affidavit submitted in support of a warrant application by the State police for the purpose of attaching a global positioning system device to a criminal defendant's vehicle and then tracking its location over a thirty-one-day period contained sufficient information on which a finding of probable cause could be made. [383-385]

The evidence at the trial of indictments charging the defendant with arson and related offenses was sufficient to prove beyond a reasonable doubt that the defendant had participated in the charged offenses. [385-387]

At a criminal trial, the judge's admission of certain testimony and physical evidence did not constitute an abuse of discretion, where the probative value of the evidence was not outweighed by the risk that the jury might interpret the evidence as proof of the defendant's propensity to commit the crimes charged. [388-389]

A criminal defendant was entitled to a modification of a condition of probation that prevented him from using any computers while in prison, where that condition violated his constitutional right of access to the courts by effectively denying him access to research and legal materials otherwise available to prison inmates. [389-390]

At a criminal trial, a Superior Court judge did not err in admitting, under the joint venturer exception to the hearsay rule, out-of-court statements made by a coventurer to a third party, where the statements were made during the course of an ongoing criminal enterprise. [390-391]

A Superior Court judge's modification of a cautionary instruction concerning the jury's assessment of the significance of the lack of a recording of a police interrogation, although problematic, did not, in the circumstances, prejudice the defendant. [391-393]

INDICTMENTS found and returned in the Superior Court Department on October 23, 2007; December 21, 2007; and September 2, 2009.

After consolidation, a pretrial motion to suppress evidence was heard by *Robert C. Cosgrove*, J., and the cases were tried before *John S. McCann*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

INDICTMENTS found and returned in the Superior Court Department on October 23, 2007; December 21, 2007; and September 2, 2009.

After consolidation, a pretrial motion to suppress evidence was heard by *Robert C. Cosgrove*, J., and the cases were tried before *John S. McCann*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Brandon L. Campbell* for John Rousseau.

*Andrew S. Crouch* for Michael Dreslinski.

*Eileen M. O'Brien & Jennifer L. Sullivan*, Assistant Attorneys General, for the Commonwealth.

*Beth L. Eisenberg*, Committee for Public Counsel Services, & *Matthew R. Segal & John Reinstein*, for Committee for Public Counsel Services & another, amici curiae, submitted a brief.

*Kit Walsh*, for Electronic Frontier Foundation, amicus curiae, submitted a brief.

CORDY, J. In separate trials, John Rousseau and Michael Dreslinski were each convicted of four indictments charging arson, G. L. c. 266, § 2; one indictment charging breaking and entering in the nighttime with intent to commit a felony, G. L. c. 266, § 16; one indictment charging malicious destruction of property over $250, G. L. c. 266, § 127; and one indictment charging malicious injury to a railroad, G. L. c. 160, § 225. The convictions arose out of their participation in a series of criminal

acts involving the burning and vandalizing of four different properties during the summer of 2007. The defendants appealed, and we transferred the cases to this court on our own motion.

On appeal, both defendants argue that a warrant secured by the State police for the purpose of attaching a global positioning system (GPS) device to Dreslinski's vehicle, and then tracking its location over a thirty-one-day period, was not supported by probable cause and was overly broad, and therefore violated the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights. Although the Commonwealth contended below that neither defendant has standing to challenge the sufficiency of the warrant because they did not enjoy a reasonable expectation of privacy in the vehicle or its location, on appeal it essentially concedes that Dreslinski has standing, but contends that Rousseau, a "mere passenger" in the vehicle, does not.

Rousseau separately asserts that the evidence at his trial was insufficient to prove beyond a reasonable doubt that he participated in the charged offenses, and that the trial judge abused his discretion by admitting prejudicial character evidence. He also contends that the conditions of probation imposed at sentencing, which prevent him from using any computer while in prison, violate his constitutional right of access to the courts under the First, Sixth, and Fourteenth Amendments to the United States Constitution and arts. 12 and 16 of the Massachusetts Declaration of Rights.

Dreslinski does not challenge the sufficiency of the evidence at his trial, but claims that the judge erred by admitting out-of-court statements made by Rousseau to a third party, a news photographer, under the joint venturer exception to the hearsay rule. Dreslinski also argues that the judge erred in modifying the cautionary instruction set forth in *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 447-449 (2004) (*DiGiambattista*), by informing the jury that they could consider evidence that Dreslinski "waived" his right to have his police interrogation recorded, in assessing the significance of the lack of a recording.

With respect to the defendants' challenge to the GPS warrant, we conclude that Dreslinski has standing as the owner and operator of the vehicle and that Rousseau, as a passenger in the

vehicle, also has standing because he had a reasonable expecta-
tion that his movements would not be subjected to extended
electronic surveillance by the government through use of GPS
monitoring. We also conclude that the affidavit submitted in
support of the warrant application contained sufficient informa-
tion on which a finding of probable cause could be made. We
reject Rousseau's arguments concerning the sufficiency of the
evidence and the judge's admission of allegedly prejudicial evi-
dence. We conclude, however, that the conditions of Rousseau's
probation violate his constitutional right of access to the courts
by effectively denying him access to research and legal materials
otherwise available to prison inmates and that he is entitled to a
modification of the condition.

Regarding Dreslinski's separate claims, we affirm the trial
judge's admission in evidence of Rousseau's out-of-court state-
ments given that they were made during the course of an ongo-
ing criminal enterprise. And, although we have reservations
about the judge's use of the word "waiver" in his modified *Di-
Giambattista* instruction, we do not conclude that its use in the
circumstances presented here was error requiring a new trial.
Accordingly, we affirm the defendants' convictions.[1]

*Background.* In early 2007, State police commenced an invest-
igation into the activities of Rousseau and Dreslinski, close
friends living in Clinton. On July 19, 2007, the State police ap-
plied for a warrant to place a GPS device on Dreslinski's pickup
truck. The warrant application was supported by an affidavit
sworn to by Trooper Carla B. Pivero, based on her "direct in-
vestigation and information [she] received from fellow offi-
cers," as well as information provided by a "cooperating wit-
ness." The affidavit alleged that "the crimes [of] arson, larceny,
breaking and entering, and impersonating a police officer have
been, are being, and/or are about to be committed" by Rousseau
and Dreslinski, and that the pickup truck was an instrument of
that criminality.

Based on the information provided in the affidavit, a Superior
Court judge issued a warrant authorizing the State police to

[1]We acknowledge the amicus brief of the Committee for Public Counsel
Services and the American Civil Liberties Union of Massachusetts as well as
the amicus brief of the Electronic Frontier Foundation.

"install, test, maintain and remove a GPS tracking device" on Dreslinski's pickup truck at "[a]ny such location where said vehicle . . . may be found . . . [in] Massachusetts" and to monitor the tracking information for a period of fifteen days. State police successfully installed the GPS on July 20, 2007, and collected tracking information until August 19, 2007.[2] During this period, information obtained from the GPS device showed that Dreslinski's truck was at or near the scene of fires set in four separate locations around the time they were set, on July 29 and 30, and August 12 and 13.[3]

The defendants were arrested on August 19, 2007. A search warrant executed at Dreslinski's residence revealed fire call boxes, light bars, tools, police radios, and a list of frequencies. Also seized were items of clothing including black battle dress uniforms (BDUs) (which tested positive for the presence of gasoline), a police "duty belt," T-shirts, and gloves, which were consistent with clothing worn by the defendants in surveillance footage on the evenings of the fires. An examination of Dreslinski's computer revealed directions to and photographs of one of the locations, and also revealed that Dreslinski had initiated Internet searches relating to the fires. A search of Dreslinski's truck uncovered newspaper articles about the fires, a "coalminer's [head]lamp," a radio scanner and a list of radio scanner frequencies, bolt cutters,[4] a pry bar,[5] leather gloves, and a video camera labeled with the name "Rousseau."

A search warrant executed at Rousseau's house revealed similar BDU-style pants, a reflective raincoat, a hat and gloves, radios, a police duty belt, a security badge, electrical meters, radio frequencies, postings of local police call signs and radio frequencies, and an industrial railroad lock. During the search

---

[2]The global positioning system (GPS) warrant was renewed on August 3, 2007, for fifteen additional days, and again on August 17, for seven additional days.

[3]The fires occurred at the following Massachusetts locations: (1) the Boston & Maine Railroad communications bungalow in Florida; (2) the Usher Paper Mill in Erving; (3) the Mary Elizabeth Sawyer House in Sterling; and (4) the Sandstrom Dairy Farm in Holden.

[4]At both trials, there was expert testimony regarding similarities between the bolt cutters and damage done to property at one of the fires.

[5]There was also expert testimony that the pry bar could have been used to gain access to one of the buildings set on fire.

of the backyard, police also discovered a "fire pit" with a can of flammable liquid nearby, a simulated electrical transformer, and fire call boxes. A search of Rousseau's computer revealed Internet searches of the fire locations.

On December 21, 2007, the defendants were indicted by a Worcester County grand jury for their involvement in fires set in Sterling and Holden, and on September 2, 2009, the defendants were indicted by a Franklin County grand jury in connection with fires set in the towns of Florida and Erving. See note 3, *supra*. The indictments were consolidated for trial in the Worcester Superior Court, where the defendants were tried and convicted by separate juries.

*Discussion.* 1. *Validity of GPS warrant.* a. *Motion to suppress.* In July, 2008, an evidentiary hearing was held on the defendants' motions to suppress all evidence flowing from the issuance of the GPS warrant. The defendants argued that Trooper Pivero's affidavit, which included a summary of an incriminating recorded conversation that took place on July 9, 2007, between a cooperating witness and the defendants,[6] overstated Rousseau's participation in the conversation and amounted to a deliberate falsehood or showed deliberate disregard for the truth. See *Commonwealth* v. *Long*, 454 Mass. 542, 552-553 (2009). They argued that once the summary of that conversation was excised from the affidavit it would contain insufficient information on which to base a finding of probable cause.[7] In response, the Commonwealth argued that neither Rousseau nor

[6]Trooper Pivero averred that the recording of this conversation had previously been authorized by a warrant.

[7]The defendants also argued that the GPS warrant was essentially an anticipatory warrant, and that the affidavit was defective because it did not specify a triggering event. See *United States* v. *Grubbs*, 547 U.S. 90, 94-99 (2006). The defendants' argument, which they renew here, is unpersuasive, however, because there was a sufficient nexus between the defendants' ongoing criminal enterprise and Dreslinski's vehicle to conclude that GPS monitoring of the vehicle would produce evidence that was relevant to the future prosecution of the defendants' criminal activity. *Commonwealth* v. *Connolly*, 454 Mass. 808, 825-826 (2009) (*Connolly*). Dreslinski separately argued that the warrant was defective because it was not executed within seven days. This argument, which Dreslinski renews here, fails in light of our decision in *Connolly*, *supra* at 825, where we held that GPS warrants are issued under the court's common-law authority, and that a fifteen-day period of surveillance, measured from the date of issuance, is reasonable. Here, police monitored Dreslinski's vehicle for

Dreslinski had standing to challenge the constitutional validity of the GPS warrant.

The motion judge concluded that "Rousseau had no reasonable expectation of privacy in either Dreslinski's driveway or his unattended truck" and that he could not "vicariously assert any rights that Dreslinski might enjoy." The judge further concluded that neither "attaching the GPS device . . . [nor] monitoring the GPS device's signals" infringed on Dreslinski's reasonable expectation of privacy because the former was minimally invasive, and the latter was even less intrusive than traditional police surveillance on a public way.[8] Consequently, neither defendant had standing to challenge the validity of the GPS warrant. Finally, the judge reasoned that even assuming the defendants had standing, the affidavit, properly excised, still alleged facts sufficient to establish probable cause and, therefore, was not defective.

On appeal, the defendants renew their challenge to the validity of the GPS warrant in light of our subsequent decision in *Commonwealth* v. *Connolly*, 454 Mass. 808, 818 (2009) (*Connolly*) (installation and police use of GPS to track defendant's vehicle constituted "seizure" under art. 14), and the United States Supreme Court's decision in *United States* v. *Jones*, 132 S. Ct. 945 (2012) (*Jones*) (attachment of GPS and its use to track vehicle is "search" within meaning of Fourth Amendment).

b. *Standing.* In this case, there is no possessory element to any of the charged offenses that would trigger the doctrine of automatic standing as we have applied it. See *Commonwealth* v. *Mubdi*, 456 Mass. 385, 391-394 (2010), and cases cited. Thus, our discussion is directed to whether Dreslinski and Rousseau have standing based on their right to be free from unreasonable government intrusions on their property or their reasonable expectation of privacy.[9]

In *Connolly, supra* at 818, we considered whether the "use

---

fifteen days, whereupon they applied for, and were granted, two extensions. Thus, at no point did police monitor the vehicle outside the successive fifteen-day periods authorized by those warrants.

[8]The judge reasoned that police officers monitoring a GPS device were limited to inferences based on the location of the vehicle, whereas traditional surveillance gave a "detailed picture of one's life."

[9]Rousseau alludes to the possibility that he has standing to challenge the

of a GPS device [was] either a search or a seizure" under art. 14. In that case, police obtained a warrant to install a GPS device on the defendant's minivan for a period of fifteen days. *Id.* at 811. Relying, in part, on information obtained from the GPS device, police secured a search warrant for the minivan and, on execution, discovered a large quantity of "crack" cocaine. *Id.* at 812. The defendant challenged the search, arguing that police had continued to utilize the GPS device after the GPS warrant had expired. *Id.* at 818.

Although rejecting the defendant's claim that the GPS warrant had expired, the court went on to discuss, as a matter of first impression, the constitutional significance of the attachment and use of a GPS device on the defendant's vehicle. It concluded that both "the initial installation of the [GPS] device" on the defendant's minivan and "the police use of the defendant's minivan to conduct GPS monitoring for their own purposes constituted a *seizure*" under art. 14 (emphasis added). *Id.* at 822-823. In so concluding, the court reasoned that "[w]hen an electronic surveillance device is installed in a motor vehicle . . . the government's *control and use* of the defendant's vehicle to track its movements interferes with the defendant's interest in the vehicle notwithstanding that he maintains possession of it" (emphasis added). *Id.* at 823. Thus, the court's decision focused on the government's physical trespass on and use of the vehicle without the defendant's permission.

In a concurring opinion, three Justices postulated that the appropriate constitutional concern regarding the installation and use of GPS monitoring by the police was "not the protection of property but rather the protection of the reasonable expectation of privacy." *Id.* at 833 (Gants, J., concurring). The concurring Justices concluded that the defendant had a reasonable expectation that his "comings and goings will not be continuously and contemporaneously monitored except through physical surveil-

_____

GPS warrant based on the language of the wiretap statute, G. L. c. 272, § 99 P, which states that "[a]ny person who is a defendant in a criminal trial . . . may move to suppress the contents of any intercepted wire or oral communication or evidence derived therefrom." However, in *Connolly, supra* at 825, we conclusively stated that "[d]ata from GPS devices . . . does not fall within the language of the wiretap statute, G. L. c. 272, § 99." Rousseau's argument is unavailing.

lance, which requires a far greater investment of police resources and generates far less information than GPS monitoring." *Id.* at 835 (Gants, J., concurring). Based on this rationale, the concurring Justices reasoned that the defendant had been subjected to a *search* within the meaning of art. 14.

Following our decision in *Connolly*, the United States Supreme Court decided *Jones*, *supra* at 948, which involved the installation of a GPS device on the undercarriage of a defendant's vehicle beyond the period authorized in a search warrant. The defendant, who was "the exclusive driver" of the vehicle,[10] argued that the attachment of the GPS device constituted a search or seizure under the Fourth Amendment, and was illegal without a valid warrant supported by probable cause. *Id.* at 948 & n.2. The government argued that a warrant was not required. *Id.* at 950. All nine Justices agreed that the government's GPS monitoring of the defendant's vehicle constituted a search under the Fourth Amendment, although they reached the result through two different rationales. *Id.* at 949; *id.* at 954 (Sotomayor, J., concurring); *id.* at 958 (Alito, J., concurring).

Between Justice Scalia's opinion for the Court and Justice Sotomayor's concurrence, five of the Justices concluded that where the government obtains information by physically intruding or trespassing on a privately owned vehicle[11] in order to monitor the vehicle's movements, it has conducted a *search*. *Id.* at 949, 950 n.3; *id.* at 954-955 (Sotomayor, J., concurring). In this manner, despite referring to the police intrusion as a "search," the Court analyzed the government's actions under the same property-based rubric as the majority in *Connolly*. See *Jones*, *supra* at 949. Even so, the Court stressed that trespass was not the exclusive test for determining whether a "search" had occurred and that "situations involving merely the transmission of electronic signals without trespass would *remain* subject to [the reasonable expectation of privacy] analysis" (emphasis in original). *Jones*, *supra* at 953. See *id.* at 954-955

---

[10] In *United States* v. *Jones*, 132 S. Ct. 945, 949 n.2 (2012) (*Jones*), the defendant did not own the vehicle in question; it was registered to his wife. However, the Court noted that the defendant was "the exclusive driver" and "had at least the property rights of a bailee." *Id.*

[11] Justice Scalia concluded that a vehicle is plainly an "effect" subject to the protection of the Fourth Amendment. *Jones*, *supra* at 949.

(Sotomayor, J., concurring), quoting *Kyllo* v. *United States*, 533 U.S. 27, 33 (2001) ("even in the absence of a trespass, 'a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable' "). As such, five Justices concluded that the reasonable expectation of privacy test formulated in *Katz* v. *United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring), "augmented, but did not displace or diminish, the common-law trespassory test" recognized in *Olmstead* v. *United States*, 277 U.S. 438, 464-466 (1928). *Jones, supra* at 955 (Sotomayor, J., concurring).

In a concurring opinion, Justice Alito, joined by three other Justices, agreed with Justice Sotomayor's conclusion that "longer term GPS monitoring" of the defendant's public movements[12] violated the defendant's reasonable expectation of privacy, without regard to whether there was a physical trespass. *Jones, supra* at 964 (Alito, J., concurring); *id.* at 955 (Sotomayor, J., concurring).[13] Justice Sotomayor and the separately concurring justices concluded that the "unique attributes of GPS surveillance" are of particular concern, as it can generate a comprehensive record of a person's public movements at a cost far below conventional techniques, such that it may "evade[] the ordinary checks that constrain abusive law enforcement practices." *Id.* at 955-956 (Sotomayor, J., concurring). See *id.* at 963-964 (Alito, J., concurring). In addition, pervasive monitoring "chills associational and expressive freedom" and allows the government "to assemble data that reveal private aspects of identity," potentially "alter[ing] the relationship between citizen and government in a way that is inimical to democratic society." *Id.* at 955-956 (Sotomayor, J., concurring), quoting *United States* v. *Cuevas-Perez*, 640 F.3d 272, 285 (7th Cir. 2011) (Flaum, J., concurring), cert. granted, 132 S. Ct. 1534 (2012). See *Jones, supra* at 963-964 (Alito, J., concurring). In this manner, the rationales of the concurring Justices in *Jones* were largely

---

[12]The concurring opinions did not define the limits of what "longer term" monitoring might be.

[13]Justice Alito indicated he would abandon altogether the property-based trespass analysis relied on by Justice Scalia, and look exclusively to whether the defendant's "reasonable expectation of privacy [was] violated by the long term monitoring of the vehicle he drove." *Id.* at 957-958 (Alito, J., concurring).

consistent with the reasoning expressed in the concurring opinion in *Connolly*.

With these decisions in mind, we now proceed to determine whether Dreslinski and Rousseau have standing to challenge the GPS warrant. As to Dreslinski, whether we characterize the government's intrusion as a "seizure" under *Connolly* or a "search" under *Jones*, by attaching a GPS device to his vehicle and tracking its movements, the government invaded Dreslinski's property and "controll[ed] and use[d]" it for its own purposes. *Connolly*, *supra* at 823. See *Jones*, *supra* at 949, 950 n.3. Consequently, he has standing under both the Fourth Amendment and art. 14 to challenge the GPS warrant.

The harder question, not directly considered in *Connolly* or *Jones*, is whether Rousseau has standing to make a similar challenge given that he was a "mere passenger" having no possessory interest in Dreslinski's pickup truck. With respect to Rousseau, the government's actions are neither a "seizure" of his property under art. 14, because the police did not "control and use" Rousseau's vehicle, *Connolly*, *supra* at 823, nor a search of an "effect" in which he had a property interest protected by the Fourth Amendment. *Jones*, *supra* at 949.

Thus, we must decide whether our property-based analysis in *Connolly* represents the outer limits of the protections afforded by art. 14 or whether, even in the absence of a property interest, the government's contemporaneous electronic monitoring of one's comings and goings in public places invades one's reasonable expectation of privacy. We conclude that under art. 14, a person may reasonably expect not to be subjected to extended GPS electronic surveillance by the government, targeted at his movements, without judicial oversight and a showing of probable cause. See *Jones*, *supra* at 954-955 (Sotomayor, J., concurring). See, e.g., *People* v. *Weaver*, 12 N.Y.3d 433, 444-447 (2009) (defendant had reasonable expectation of privacy in location of vehicle, and placing GPS device on vehicle constituted search under art. I, § 12, of Constitution of State of New York). Although we need not decide how broadly such an expectation might reach and to what extent it may be protected, the fact that police monitored Rousseau over a thirty-one-day period is sufficient to establish that he has standing to challenge the validity of the warrant.

c. *Probable cause.* In light of what we have said, we consider whether the affidavit in support of the GPS warrant contained sufficient information to support the judge's finding of probable cause.

> "[W]arrants for GPS monitoring of a vehicle may be issued under the courts' common-law authority, in circumstances . . . where [there is] probable cause to believe that a particularly described offense has been, is being, or is about to be committed, and that GPS monitoring of the vehicle will produce evidence of such offense or will aid in the apprehension of a person who the applicant has probable cause to believe has committed, is committing, or is about to commit such offense."

*Connolly, supra* at 825. Here, even assuming, as the defendants argue, that Trooper Pivero's affidavit overstated Rousseau's participation in the conversation recorded on July 19, and that such hyperbole must be excised, *Commonwealth* v. *Long,* 454 Mass. 542, 552-553 (2009), we conclude that the remaining information was more than sufficient to establish probable cause to issue the GPS warrant.

The affidavit set forth Rousseau's and Dreslinski's extensive criminal histories,[14] as well as the details of a 2003 police investigation of the two men involving arson and impersonating a police officer.[15] The affidavit also provided information obtained in 2007 from a cooperating witness who told police that

---

[14]According to the affidavit, Rousseau previously had been convicted of multiple "arson and larceny related offenses," including knowingly receiving stolen property; breaking and entering in the daytime with the intent to commit a felony; larceny over $250; breaking and entering in the nighttime with the intent to commit a felony; three convictions of burning personal property; malicious destruction of property; cruelty to animals; tampering with a fire call box; two convictions of larceny over $250; possession of burglarious tools; and conspiracy. Dreslinski had previously been convicted of multiple "similar offenses," including two separate convictions of breaking and entering in the nighttime with the intent to commit a felony; breaking and entering in the nighttime; three convictions of larceny over $250; two convictions of burning personal property; malicious destruction of property; tampering with a fire call box; and conspiracy.

[15]The 2003 investigation involved a fire at 817 Main Street in the defendants' hometown of Clinton. Following the investigation, Rousseau was charged with four counts of arson of a dwelling, one count of arson of a building, one

Rousseau and Dreslinski "personally informed him of crimes they [had] committed," including setting several fires,[16] stealing and using police radios and other emergency equipment,[17] and breaking into the Massachusetts Highway Department and the Department of Conservation and Recreation to steal vehicle parts and accessories. The affidavit further included statements made by Dreslinski to the cooperating witness, in Rousseau's presence, about how Dreslinski had made multiple visits to a business in Marlborough to "[check] it out" and how he was "getting things ready" to "do it soon." The affidavit also described the state of the then-existing investigation, including statements by witnesses who observed two men in a pickup truck, matching a description of Dreslinski's vehicle, driving away at a high rate of speed from the scene of a fire in Rutland on July 15, 2007.[18]

"In dealing with probable cause, . . . we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. . . . Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is

---

count of burning personal property, and one count of impersonating a police officer. The arson-related charges were dismissed, but Rousseau was convicted of impersonating a police officer and received a sentence of 222 days.

[16]The informant, CB, described one instance where Rousseau admitted to setting a fire behind his house on April 24, 2007, and a second instance on the same date, when CB encountered Rousseau and Dreslinski immediately after they had set fire to woodlands behind a wastewater treatment plant in Clinton. Both instances were corroborated by reference to the Clinton fire department records. CB also stated that Rousseau admitted that he and Dreslinski had broken into DKD Foundations, Inc., and burned construction vehicles, an incident also corroborated by records of the State fire marshal's office.

[17]Dreslinski told CB that on June 28, 2007, he and Rousseau had stripped a Leominster police cruiser of all its emergency and radio equipment. This was corroborated by Detective Lieutenant Pellechia of the Leominster police department.

[18]As permitted by Commonwealth v. Long, 454 Mass. 542, 553 (2009), the motion judge also watched the videotape of the July 9 conversation that was summarized in the affidavit and properly considered some of the "damning" statements made by Dreslinski and Rousseau during that conversation, apart from the portion of the summary that he excised.

being committed. . . ." *Commonwealth* v. *Walczak,* 463 Mass. 808, 848 (2012) (Spina, J., concurring in part and dissenting in part), quoting *Brinegar* v. *United States,* 338 U.S. 160, 175 176 (1949). Based on this standard, the information contained in Trooper Pivero's affidavit is sufficient to support a finding of probable cause.

2. *Rousseau's trial.* a. *Sufficiency of the evidence.* Rousseau argues that the evidence adduced at his trial was insufficient to prove beyond a reasonable doubt that he committed the offenses of which he was convicted.[19] In particular, he contends that there was no proof that he was at the scene of the fires when they were started. In reviewing the sufficiency of the evidence, we consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v. *Latimore,* 378 Mass. 671, 677 (1979), quoting *Jackson* v. *Virginia,* 443 U.S. 307, 318-319 (1979). We set forth the relevant evidence.

The first fire occurred on July 29, 2007, and involved the Boston & Maine Railroad communications bungalow located in Florida. On that date, the GPS device indicated that Dreslinski's vehicle briefly stopped at a convenience store in North Adams at approximately 9:15 P.M. Surveillance footage at that location captured the defendants wearing portable radios on their waists with shoulder microphones, and a receipt from the store indicates that the defendants purchased gasoline. Dreslinski's vehicle then traveled to the communications bungalow, arriving at approximately 10 P.M., where it remained for approximately forty-five minutes. At 10:15 P.M., the remote radio at the railroad bungalow became inoperable and was unable to transmit. It was later discovered that the lock securing the bungalow was missing, and inside, the coaxial cables had been cut, the electrical circuit breaker panel had been smashed, and a fire had damaged other equipment. The State police determined that the fire had been set intentionally, although there was no indication that accelerants were used.

---

[19]The evidence admitted at both trials was essentially the same except for Dreslinski's statements to police following his arrest, which were admitted only at Dreslinski's trial.

The second fire, at the Usher Paper Mill located in Erving, occurred early the next morning on July 30, 2007.[20] After Dreslinski's truck left the communications bungalow, the GPS tracked it traveling to the mill,[21] where it arrived at 12:05 A.M.[22] It remained there for seventeen minutes before departing at 12:21 A.M. Shortly thereafter, at approximately 12:51 A.M., a motorist noticed flames coming from the mill and telephoned 911. Meanwhile, Dreslinski's truck traveled to a coffee shop in Greenfield, arriving at 12:50 A.M. There, surveillance footage shows Rousseau and Dreslinski both present and buying food. Thereafter, the truck returned to the mill, and at approximately 1:18 A.M. Rousseau started contacting news outlets. The State police later determined that the fire had been intentionally set in two separate locations using an accelerant such as gasoline, and was not caused by any electrical source.

The third fire occurred two weeks later on August 12, 2007, and involved the historic Mary Elizabeth Sawyer House (Sawyer House) in Sterling. At approximately 3 A.M., Dreslinski's truck was tracked driving toward Sterling and stopping at a gasoline station in Hudson, where a surveillance camera shows Rousseau getting out of the truck, entering the store, making a purchase, and returning to the truck. The truck then proceeded to the Sawyer House,[23] arriving at 3:43 A.M. It remained at the house for about three minutes and then left. At approximately 4:30 A.M., a witness spotted flames coming from the house and telephoned 911. Later that afternoon, Rousseau went to the Sterling police station, where he told the dispatcher that an off-duty Rutland police officer had told him the Sterling police were looking for him. The dispatcher found no evidence of Rousseau's claim in the report log. Rousseau then went to the Rutland police station and

[20]There was testimony that the mill had not been in active use since approximately 1993 and was uninsured; that all the equipment had been removed; and that there was no electrical service into the building.

[21]Before heading to the Usher Paper Mill, the truck briefly stopped at a coffee shop, where video surveillance shows Rousseau entering the store to use the restroom and then returning to the truck outside.

[22]A volunteer fire fighter, who was at a house adjacent to the Usher Paper Mill at approximately 11:45 P.M., testified that there were no signs of any fire at the mill.

[23]There was testimony that the Mary Elizabeth Sawyer House was unoccupied and without electrical service or a heat source.

filed a written request that he be given a police radio frequency, but he soon became agitated and left.[24] He proceeded to contact Terry McNamara, a news photographer with a local television station, and attempted to convince his station to report on the fire. State police later determined that the fire at the Sawyer House had been deliberately set using a petroleum accelerant.

The final fire occurred early the next morning, August 13, 2007, at the Sandstrom Dairy Farm in Holden. At approximately 1 A.M., surveillance footage shows the defendants stopping at a gasoline station in West Boylston, where they purchased fuel. The GPS then tracked Dreslinski's truck to the farm, arriving at 2:41 A.M. and leaving at 2:47 A.M. Less than twenty minutes later, an off-duty Rutland police officer reported flames coming from the barn at the farm. It was subsequently determined that the fire was caused by open flame applied to available combustible materials.[25] The fire destroyed part of the barn as well as some equipment.

Based on the GPS tracking information placing Dreslinski's truck at each scene near the time the fires were set, and the surveillance footage capturing Rousseau and Dreslinski together, getting in and out of the truck before and after the fires, there was ample evidence to support the inference that Rousseau was in the truck when the fires were started. Additionally, Rousseau's telephone calls to various news outlets strongly support the inference that he was complicit in the fires. Further, his appearances at the Sterling and Rutland police stations are highly probative of his consciousness of guilt. Finally, Rousseau was tied to the scenes by evidence found at his house, including clothing worn on the evenings the fires were set that made him appear to be a law enforcement or security officer; maps of the area; postings of local law enforcement call signs and radio frequencies; and other fire-related equipment. Based on this circumstantial evidence, a rational juror could have concluded beyond a reasonable doubt that Rousseau participated with Dreslinski in setting the fires.

---

[24]The radio frequency Rousseau requested was a fictitious one police had created because they suspected the arsonist was monitoring their frequencies.

[25]There was testimony by James Sandstrom, the owner of the farm, that there were no flammable chemicals located in the barn, and that electrical power was turned off at the time of the fire.

b. *Irrelevant and prejudicial evidence.* Rousseau argues that the trial judge erred in admitting certain testimony and physical evidence because it was irrelevant and amounted to prejudicial character evidence. See *Commonwealth* v. *Mullane*, 445 Mass. 702, 708 (2006). In particular, Rousseau cites (1) the testimony of a Greenfield police dispatcher, Nicholas Licata, that Licata had met Dreslinski and Rousseau on several occasions and had also seen photographs of them; (2) the testimony of a Sterling police dispatcher, Joshua Hubert, that Rousseau was trying to obtain information at the police station; (3) the testimony of a Rutland police officer, Troy Chauvin, that a fictitious radio frequency was created because the police believed that individuals were monitoring and interfering with the police transmissions and that Rousseau had requested the frequency; and (4) evidence, including a police badge, a cup with firecrackers, a light bar for a police cruiser, police crime scene tape, and a can of flammable liquid, that police found at Rousseau's premises.

" 'Relevant evidence' is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Mass. G. Evid. § 401 (2012). Such "evidence is admissible unless unduly prejudicial, and, '[i]n weighing the probative value of evidence against any prejudicial effect it might have on a jury, we afford trial judges great latitude and discretion, and we uphold a judge's decision in this area unless it is palpably wrong.' " *Commonwealth* v. *Arroyo*, 442 Mass. 135, 144 (2004), quoting *Commonwealth* v. *Sicari*, 434 Mass. 732, 752 (2001), cert. denied, 534 U.S. 1142 (2002).

Here, all the challenged evidence was relevant. Dispatcher Licata testified that the clothing the defendants wore when they came to the Greenfield police station on July 29, just prior to the fire at the communications bungalow, was unusual for non-police personnel and that Rousseau was more talkative than Dreslinski.[26] Thus, the fact that he had met the defendants before

---

[26] On July 29, 2007, prior to driving to the Boston & Maine Railroad communications bungalow, Dreslinski and Rousseau stopped at the Greenfield police station and requested copies of a police report. There was testimony that the defendants were wearing BDU-style pants and carrying portable two-way radios.

that encounter and had seen their photographs was relevant in establishing his basis of knowledge and his identification of them. Similarly, Dispatcher Hubert's report that Rousseau was "digging" for information and Officer Chauvin's testimony that Rousseau requested a fictitious radio frequency were probative of his motive and intent as the events occurred one day prior to the fire at the Sandstrom Dairy Farm. See note 24, *supra*; *Commonwealth* v. *Mullane*, *supra* at 708-709. Finally, the evidence found at Rousseau's home went to his knowledge about, and ability to set, fires and disputed his claim that he was an innocent bystander. *Id.*

Nor do we think the probative value of any of this evidence was outweighed by the risk that the jury might interpret the evidence as proof of Rousseau's propensity to commit the crimes charged. Instead, the evidence represented instances of conduct that were part of a larger continuum of behavior constituting a single criminal enterprise. See *Commonwealth* v. *Robidoux*, 450 Mass. 144, 158 (2007), quoting *Commonwealth* v. *Marrero*, 427 Mass. 65, 67 (1998) (prosecution entitled to present as full picture as possible of events surrounding incident itself). The judge did not abuse his discretion in admitting the evidence.

c. *Probationary condition.* Rousseau argues that the judge's sentencing order, that "[t]he [d]efendants are not to have the use of computers while in the state prison system," violated his right of access to the courts under the First, Sixth, and Fourteenth Amendments and arts. 12 and 16. Following sentencing, Rousseau moved that the condition of probation be amended so that he could use computers while incarcerated "for purposes of legal research and for educational and rehabilitative purposes." In support of his motion, the defendant included evidence that the Department of Correction had switched to computerized law library access. The judge denied Rousseau's motion.

In determining a sentence, a judge is authorized to place a defendant on probation and to impose any conditions that the judge deems proper. G. L. c. 276, § 87. Judges are permitted significant latitude in imposing conditions of probation, *Commonwealth* v. *Pike*, 428 Mass. 393, 402 (1998), citing *Commonwealth* v. *Power*, 420 Mass. 410, 413-414 (1995), cert.

denied, 516 U.S. 1042 (1996), and "[a] probation condition is not necessarily invalid simply because it affects a probationer's ability to exercise constitutionally protected rights." *Commonwealth* v. *Power, supra* at 415, quoting *United States* v. *Tonry*, 605 F.2d 144, 148 (5th Cir. 1979). "A probation condition that infringes on constitutional rights must, however, be 'reasonably related' to the goals of sentencing and probation," *Commonwealth* v. *Pike, supra* at 403, which are rehabilitation of the probationer and protection of the public. *Commonwealth* v. *LaFrance*, 402 Mass. 789, 795 (1988). "These goals are best served if the conditions of probation are tailored to address the particular characteristics of the defendant and the crime." *Commonwealth* v. *Pike, supra.*

Here, the sentencing judge imposed the condition of probation because he was concerned that the defendants might "use prison facilities, such as computers, to enhance the image of themselves or their past acts of arson." In light of the evidence presented at trial that Rousseau and Dreslinski actively sought to publicize their criminal acts, we think that such a probationary condition is reasonably related to the goal of curtailing this type of attention-seeking behavior.

However, given that the Department of Correction has digitized its law library, we agree that the breadth of the probationary condition would have the practical effect of denying Rousseau access to the courts. Although impingement on a constitutional right does not necessarily invalidate a condition of probation, *Commonwealth* v. *Power, supra,* this particular condition is overly broad. Thus, we conclude that Rousseau is entitled to a modification, permitting him to use the prison library computers for the limited purpose of conducting legal research and other activity related to his case. However, Rousseau can be barred from using the library computers for any other purpose.

3. *Dreslinski's trial.* a. *Rousseau's out-of-court statements.* Dreslinski argues that the trial judge erred in allowing news photographer Terry McNamara to testify about Rousseau's out-of-court telephone statements to him after the fire at the Sawyer House on August 12. In their conversation, Rousseau told McNamara about the fire and asked McNamara whether his television station would be covering the fire.

Hearsay is an out-of-court statement offered by a witness at trial or hearing to prove the truth of the matter asserted. Mass. G. Evid. § 801(c) (2012). Here, the out-of-court statements were uttered by Rousseau in an attempt to publicize the fire at the Sawyer House shortly after the fire had been set; consequently, we agree that the statements were part of the defendants' ongoing criminal enterprise and, thus, qualify as admissions of a "joint venturer made during the pendency of [a] cooperative effort and in furtherance of its goal. . . ." Mass. G. Evid., *supra* at § 801(d)(2)(E). See *Commonwealth* v. *Bongarzone*, 390 Mass. 326, 340 (1983).[27] As a result, Rousseau's statements to McNamara are "not hearsay" and were properly admissible for their truth. Mass. G. Evid., *supra* at § 801(d). The judge did not abuse his discretion in admitting the statements at Dreslinski's trial.

b. DiGiambattista *instruction.* Following his arrest, and after obtaining a valid Miranda waiver, police interrogated Dreslinski. Prior to commencing the interview, police asked Dreslinski for permission to record it, but he refused orally and in writing by initialing his refusal on his Miranda waiver form, also admitted in evidence. The interrogation was not recorded. An audio recording of Dreslinski's decision not to have the conversation recorded was played for the jury and admitted in evidence.

At trial, Dreslinski requested that the jury be given a cautionary instruction based on our decision in *DiGiambattista, supra* at 447-449, applicable in instances where the police do not record their custodial interrogation of a defendant. In such instances, "the defendant is entitled (on request) to a jury instruction advising that the State's highest court has expressed a preference that such interrogations be recorded whenever practicable, and cautioning the jury that, because of the absence of any

---

[27]In light of GPS tracking data placing Dreslinski's truck at the scene of the fire around the time it started; surveillance footage at a gasoline station in Sterling showing Rousseau getting out of Dreslinski's truck immediately before and after the fire; and the equipment, supplies, and other materials found at the defendants' respective houses, we conclude that a preponderance of admissible evidence, independent of the telephone call to McNamara, established that a joint criminal venture existed between Rousseau and Dreslinski. See *Commonwealth* v. *Bongarzone*, 390 Mass. 326, 340 (1983). See also *Commonwealth* v. *Silanskas*, 433 Mass. 678, 692-693 (2001).

recording of the interrogation in the case before them, they should weigh evidence of the defendant's alleged statement with great caution and care." *Id.* at 447-448. This instruction is required even when a defendant has refused a recording of his custodial interrogation. See *Commonwealth* v. *Tavares*, 81 Mass. App. Ct. 71, 73 (2011).

Here, the trial judge instructed the jury:

> "You have heard some evidence that there was no recording of the complete interrogation of the defendant conducted while he was in police custody. The Supreme Judicial Court, which is our state's highest court, expressed a preference that such interrogations be recorded whenever practicable. Since there is no complete recording of the interrogation in this case, you should weigh evidence of the defendant's alleged statement with great caution and care. The reason is that the Commonwealth may have had the ability to reliably record the total circumstances upon which it asks you to determine beyond a reasonable doubt that the defendant's statement was voluntary, but instead is asking you to rely on a summary of those circumstances drawn from the possibly fallible or selective memory of its witnesses. *In evaluating the significance of the lack of a recording in this case, you may also consider the evidence that the defendant was given an opportunity to have his interrogation recorded, and waived that right both orally and in writing*" (emphasis added).

The defendant contends that the emphasized portion of the above instruction vitiated the *DiGiambattista* instruction by informing the jury that they could consider the fact that the defendant was given the opportunity to have the interrogation recorded, but declined.

As an initial matter, we find nothing wrong with the gist of the judge's additional language, which we think "hews to the lines laid out in *DiGiambattista.*" *Commonwealth* v. *Robinson*, 78 Mass. App. Ct. 714, 722 (2011) (affirming trial judge's *Di-Giambattista* instruction that informed jury that "[y]ou may consider whether or not the defendant indicated that he wished to . . . not be recorded"). The additional instruction merely alerted the jury to a factor they were entitled to consider in

assessing why the conversation was not recorded, while leaving intact the instruction's cautionary force. See *Commonwealth* v. *Drummond*, 76 Mass. App. Ct. 625, 629 (2010) ("Particular reasons why an interrogation was not recorded are for the jury to weigh when they consider, after hearing the instruction, evidence of what the Commonwealth contends the defendant said to police").

However, while the use of an additional instruction such as given here is permissible, the use of the term "waived" is problematic. It suggested that the judge had already concluded that Dreslinski had "waived" his right to have his interrogation recorded. Whether a defendant has knowingly and voluntarily waived his right to have his or her interrogation recorded is properly left to the jury as the fact finder. Cf. *DiGiambattista, supra* at 448 ("Where voluntariness [of a confession] is a live issue . . . , the jury should also be advised that the absence of a recording permits [but does not compel] them to conclude that the Commonwealth has failed to prove voluntariness [of the defendant's confession] beyond a reasonable doubt"). Here, however, given that the defendant's election not to have his interview recorded was made both orally and in writing, and was itself tape recorded and presented as such to the jury, we conclude that the defendant was not prejudiced by this language.

In future cases, the judge should abstain from using the word "waived" when referring to the factual circumstances surrounding the defendant's decision not to have his interrogation recorded. A slight modification of the judge's instruction provided in this case is all that would be required. For example, the judge might instruct the jury that "in evaluating the significance of the lack of a recording in this case, you may also consider the evidence concerning whether the defendant was given an opportunity to have his interrogation recorded, and whether the defendant voluntarily elected not to have his interrogation recorded."

*Conclusion.* Although the defendants have standing to challenge the constitutional sufficiency of the GPS warrant, the warrant was adequately supported by probable cause, and none of the fruits flowing from the issuance of the warrant must be suppressed. We reject Rousseau's argument concerning the suf-

ficiency of the evidence and his objection to the admission of prejudicial character evidence. We do, however, agree that the conditions of Rousseau's probation should be modified in a manner consistent with this opinion. Finally, we reject Dreslinski's objection to the admission of Rousseau's out-of-court statements as well as his argument that the judge's modified *DiGiambattista* instruction constituted prejudicial error. The defendants' convictions are affirmed, and Rousseau's case is remanded for modification of his probationary terms.

*So ordered.*