NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11614


COMMONWEALTH  vs.  KYLE ALLEYNE.



Middlesex.     March 11, 2016. - July 15, 2016.

Present:  Gants, C.J., Spina, Cordy, Botsford, & Hines, JJ.


Homicide.  Jury and Jurors.  Evidence, Photograph, Inflammatory evidence, Relevancy and materiality.  Practice, Criminal, Capital case, Jury and jurors, Interrogation of jurors, Instructions to jury.  Search and Seizure, Consent. Intoxication.



Indictments found and returned in the Superior Court Department on October 21, 2010.

The cases were tried before Thomas P. Billings, J.


Chauncey B. Wood for the defendant.
Casey E. Silvia, Assistant District Attorney, for the Commonwealth.
William Trach & Laura Carey, for Massachusetts Association of Criminal Defense Lawyers, amicus curiae, submitted a brief.
Paul R. Rudof, Committee for Public Counsel Services, & David Lewis, for Committee for Public Counsel Services & another, amici curiae, submitted a brief.


HINES, J.  The defendant, Kyle Alleyne, was convicted by a jury of murder in the first degree on the theory of extreme

atrocity or cruelty[1] for the stabbing death of his wife, Heather Alleyne, and of assault and battery of Josh Elinoff, the father of the victim's newborn baby.[2] On appeal, the defendant challenges: (1) the judge's failure to conduct a voir dire of an inattentive juror; (2) evidentiary rulings allowing the admission of numerous autopsy photographs, statements of the defendant, and the victim's purse; (3) the judge's modification of jury instructions pursuant to Commonwealth v. DiGiambattista, 442 Mass. 423, 447-448 (2004); and (4) the judge's failure to alter the model instructions for extreme atrocity or cruelty. We affirm the defendant's convictions, and we discern no basis to exercise our authority pursuant to G. L. c. 278, § 33E.[3]

Background. We summarize the evidence as the jury could have found it, reserving certain facts for later discussion. The victim met the defendant, who was six years older than she was, when she was thirteen or fourteen years of age. Insofar as relevant here, the two had a dating relationship. After the victim graduated from high school she and the defendant got

---

[1] The defendant was also tried on the theory of deliberate premeditation, but the jury found him not guilty.

[2] The judge granted the defendant's motion for a required finding of not guilty on the charge of reckless endangerment of a child.

[3] We acknowledge amicus briefs submitted by the Massachusetts Association of Criminal Defense Lawyers and the Committee for Public Counsel Services.

married in March, 2009. She gave birth to their daughter in June, 2009.

The victim and her daughter moved back to her father's house for a period between October and December, 2009. At that time, the victim's brother and one of his friends, Elinoff, also lived in the father's house. The victim told Elinoff that her relationship with the defendant was "over and she was getting a divorce," and she and Elinoff engaged in a sexual relationship that ended when the victim moved back in with the defendant.

Within one month after returning to live with the defendant, the victim learned that she was pregnant. She gave birth to a baby girl on July 23, 2010. She and the defendant did not name the baby.

The defendant suspected that he might not be the father of the baby and on July 26, he and the victim submitted to a deoxyribonucleic acid (DNA) test to determine paternity. The results, establishing that the defendant was not the father, became available on August 1. On August 2, the victim called Elinoff to inform him that she had given birth to a baby and that he was the father. Elinoff, who had not spoken to the victim since she left her father's house to resume living with the defendant, responded that he would help in any way that he could. After this conversation, however, the victim sent him text messages stating that she and the defendant had decided to

give the baby up for adoption.  Elinoff responded that he would take the baby instead, and he arranged to meet the victim the following day.

The victim met Elinoff outside her apartment complex during the evening hours of August 3, bringing with her the baby and baby supplies.  The two sat in Elinoff's vehicle for approximately two hours.  They agreed on a name for the baby.  Elinoff asked for a letter authorizing custody of the baby until his name appeared on the birth certificate.  The victim went back to her apartment and came out with a document.  At one point, the defendant followed the victim out of the apartment and "tried to attack" Elinoff by "yelling," and chasing and hitting his vehicle.  Elinoff telephoned 911 as he drove away with the baby but hung up when the operator answered.

In the late evening hours of August 3 and early morning hours of August 4, Elinoff corresponded with the victim and the defendant verbally and through text messages from the defendant's cellular telephone.[4]  The victim explained that her telephone had been "smashed."  On August 4, Elinoff learned that he needed to have a "denial of paternity" form signed by the

---

[4] Josh Elinoff had communicated with the victim about a time to meet the following day.  During one of the calls, the victim "handed the [tele]phone" to the defendant.  The defendant told Elinoff that he was angry at him for "[r]uining his family and that he hated [him]."  The defendant "eventually calmed down."  Elinoff and the victim agreed to meet on August 4 at 11:30 A.M. but the victim later canceled.

victim and the defendant in order to be able to file a birth certificate. He spoke to the victim at approximately 5:30 P.M. and scheduled a meeting to take place the next day to obtain notarized signatures from the victim and defendant on the paternity form.

The victim was last heard from on August 4, at approximately 10 P.M., when she telephoned her father's girl friend to try to arrange a meeting the following day to visit her father, who was hospitalized with a serious illness.

On August 5, Elinoff drove to the victim's apartment complex at the arranged time. He did not know which apartment unit was the victim's so he called the defendant's cellular telephone and waited outside for about thirty minutes before leaving. That evening and the next day, the defendant telephoned two relatives to whom he had not spoken for at least one year. One was an aunt who lived in Florida. He told her that he was going to take a bus with his daughter to visit her.

At around noon on August 6, Elinoff went back to the apartment complex, where a group of children pointed him to the correct apartment. He "hammered on the [apartment] door" for five to ten minutes before the defendant answered and came out into the hallway, shutting the door behind him. The defendant stated that he had not heard from the victim for a few days, but he would sign his portion of the paternity form if Elinoff came

back in a few hours. The victim's mother also came by the apartment that afternoon, looking for the victim. The defendant opened the door "a crack," just "enough for his face to get through to talk to [her]," and said that the victim "took off," probably to see Elinoff or her grandmother.

Elinoff returned to the apartment at approximately 3 P.M. The defendant met him outside, and explained that he did not have a car seat for his daughter so he would leave her in the apartment. The two drove to a nearby bank to secure the services of a notary public for the paternity form. The defendant accused Elinoff of "ruining his family" and, in the bank's parking lot, read a letter written by the victim to the baby that contained derogatory statements about Elinoff. The defendant punched Elinoff in the face, knocking out two of his teeth, and then he ran away. Elinoff telephoned 911 at 3:43 P.M. When the police arrived, Elinoff reported what had happened and told them that the defendant had left his young daughter alone at the apartment.[5]

After leaving the bank parking lot, the defendant went to a local restaurant. A taxicab picked him up there at approximately 4 P.M. and drove him to three stores before

---

[5] In response to Elinoff's report, a Framingham police officer went to the defendant's apartment and knocked on the door. The officer left after three to five minutes when he was unable to gain entry.

dropping him off at his apartment.  During those stops, the defendant purchased bleach, trash bags, gloves, disinfectant wipes, packing tape, a clothesline, a mattress pad, a sleeping bag, a lighter, fuel, and a car seat.  He made a reservation with the taxicab for that evening, and at approximately 7:30 P.M., the taxicab driver drove the defendant and his daughter to an area where there were two adjacent local hotels.

At approximately 8:40 P.M. that evening, two Framingham police officers went to a local hotel for a well-being check on a child after being alerted by the hotel clerk that an intoxicated man checked into the hotel with a young child.  The officers went to the defendant's hotel room and spoke to the defendant, who was clumsy and had an alcohol odor but was able to converse with and understand the officers.

While conducting a check on the child, the officers found a woman's purse inside of a grocery bag containing a half-empty bottle of liquor.  The purse contained two identification cards with the victim's photograph and name.  The defendant explained that the purse belonged to his daughter's mother, that she had recently given birth to another child that was not his, and that she no longer wanted anything to do with this daughter.  The defendant stated that the daughter's mother was not home because she was "out whoring around" and stated that he and the daughter had been homeless for approximately four weeks.  The officers

called the Department of Child and Family Services, and the defendant's mother and grandmother were called to the hotel to assist with the child. The defendant's mother took the defendant's child home with her, and the defendant left with his grandmother.

At the defendant's request, his grandmother dropped him off at a train station. On August 8, he telephoned his aunt from Atlanta, Georgia, and requested money. She asked him to contact her later that evening, but she did not hear from him again.

On August 9, at approximately 4:30 P.M., the victim's mother went to the victim's apartment because of her concern that no one had heard from the victim since August 4. When there was no answer at the door, she called the police and requested a well-being check. The police gained entry to the apartment, where there was an odor consistent with a decomposing body. In the corner of the second bedroom, under a blanket, was a sleeping bag with a trash bag closing off one end and sealed by tape. Insects were flying above.

State police transported the body to the medical examiner's office in its wrapped condition, where it was positively identified as the victim. The sleeping bag and trash bags covering the victim matched the items purchased by the defendant on August 6. A State medical examiner performed an autopsy on August 11, determining that there were thirteen stab wounds to

the victim's body, including cuts to the carotid artery and jugular vein. The cause of death was loss of blood and oxygen.

Also on August 11, Framingham police entered a warrant for the defendant's arrest into a national database maintained by the Federal Bureau of Investigation. On August 14, police officers in Laredo, Texas, informed State police that the defendant had been detained after he had walked across the border from Mexico. Later that day, a State trooper and a Framingham detective flew to Texas and interviewed the defendant. The defendant waived his Miranda rights as well as his rights pursuant to Commonwealth v. Rosario, 422 Mass. 48, 56 (1996).[6] He spoke to the officers during a recorded interrogation, telling them that he was unaware of the victim's death. On August 15, the defendant waived extradition on the murder charge, and on August 16, the officers took custody of the defendant. While awaiting the return trip to Massachusetts, the officers read and obtained a waiver from the defendant of his Miranda rights. The defendant stated, "I've never been so happy to be arrested in my whole life." The State trooper asked

---

[6] The Rosario rule provides that "[a]n otherwise admissible statement is not to be excluded on the ground of unreasonable delay in arraignment, if the statement is made within six hours of the arrest (day or night), or if (at any time) the defendant made an informed and voluntary written or recorded waiver of his right to be arraigned without unreasonable delay." Commonwealth v. Rosario, 422 Mass. 48, 56 (1996).

what he meant, and the defendant responded, "Mexico is a fucked up place.  It was fucking crazy over there."

After arriving in Massachusetts, Framingham police officers transported the defendant to the police station for booking. The State trooper and the Framingham detective who had accompanied the defendant from Texas interviewed him, and the defendant stated "pretty emphatically that he did not want to be recorded."  The defendant signed new forms waiving his Miranda rights as well as his rights pursuant to the Rosario rule. During this interview, the defendant stated that he did not think that Elinoff was "capable of killing his wife"; he detailed the circumstances of their temporary separation, and he stated that he was not surprised by the DNA result.

At trial, the defendant testified that a third-party culprit, probably Elinoff, killed the victim.[7]  According to the defendant, Elinoff was motivated by anger that the victim wanted to give the baby up for adoption instead of allowing him to keep her.  The defendant also suggested to the jury that shortcomings in the police investigation created reasonable doubt that he had committed the murder.  In his testimony, the defendant admitted that he and the victim got into a minor "argument" on the evening of August 4 regarding the victim's desire to take the

---

[7] The police interviewed Elinoff for five hours on the night that the body was found.  The police also searched his vehicle.

baby back from Elinoff and give her up for adoption. After the argument, the defendant left the apartment with a bottle of liquor to drink in an area under a bridge where people gathered. He woke up when it was light out and walked the mile back to the apartment. He went into the bedroom and saw the victim's body. He decided to leave town instead of calling the police because he knew he would be the prime suspect. He bought supplies so that he could plan a "goodbye ceremony" for the victim and wrapped her in those items and her "favorite blanket."

Discussion. 1. Juror attentiveness. The defendant argues that the judge abused his discretion in failing to conduct a voir dire of an inattentive juror and, because this error is structural, he is entitled to a new trial. On the tenth day of trial, the prosecutor alerted the judge that the juror in seat number three "appears to be struggling to remain awake through the entire testimony."[8] The judge responded that he had not noticed, but he would "keep an eye" on the juror and he concluded that he was "not going to fiddle with the alternates without good cause, but I think maybe I'll take [the juror] off the list of potential forepeople." The prosecutor and defense counsel accepted this suggestion.

_____

[8] The prosecutor made the same comment regarding the juror in seat number twelve. Because juror number twelve was released from service prior to deliberations for a work emergency, we do not analyze any allegations regarding that juror's attentiveness.

A defendant's right to a constitutionally fair trial may be impaired by a juror sleeping through a significant portion of the trial. Commonwealth v. McGhee, 470 Mass. 638, 645-646 (2015), citing Commonwealth v. Dancy, 75 Mass. App. Ct. 175, 182 (2009). "A judicial observation that a juror is asleep, or a judge's receipt of reliable information to that effect, requires prompt judicial intervention to protect the rights of the defendant and the rights of the public, which for intrinsic and instrumental reasons also has a right to decisions made by alert and attentive jurors." Commonwealth v. Beneche, 458 Mass. 61, 78 (2010), quoting Dancy, supra at 181. "[N]ot every complaint regarding juror attentiveness requires a voir dire," however, and a judge has substantial discretion in this regard. McGhee, supra at 644, quoting Beneche, supra. The defendant bears the burden to demonstrate that a judge's response was "arbitrary or unreasonable." McGhee, supra.

Although the defendant now argues that the judge was required to hold a voir dire, the defendant has not met his burden to demonstrate that the judge acted unreasonably in deciding instead to remove the juror from the list of potential forepersons and "keep an eye" on the juror. The defendant relies on McGhee, 470 Mass at. 642, 643, 645-646, where we vacated a defendant's convictions and remanded for a new trial because the judge, based on his own "fail[ure] to observe any

sleepiness," denied requests by the prosecutor and defense counsel to hold a voir dire after receiving a reliable report that a juror had been snoring and "sound asleep" during the presentation of evidence.

This case is distinguishable from McGhee for two reasons. First, in McGhee, the report was that the juror was asleep. Here, the report was simply that the juror was "struggling to stay awake." Where a judge has only tentative information that a juror may be sleeping, it is sufficient to note the report and monitor the situation. See Beneche, 458 Mass. at 78-79. Second, the prosecutor and defense counsel in this case agreed with the judge's plan, indicating that neither considered the suggestion of monitoring to be particularly prejudicial.[9] See Commonwealth v. Lucien, 440 Mass. 658, 664 (2004) ("absence of an objection suggests the lack of any prejudice from the judge's practice").

2. Evidentiary issues. a. Autopsy photographs. The defendant challenges as unduly prejudicial the admission, over counsel's objection, of nineteen photographs and the judge's failure to give a contemporaneous limiting instruction. In particular, the defendant contends that the autopsy photographs depicting close-up and medium distance views of the thirteen

---

[9] Defense counsel indicated that he would watch the juror; he, the prosecutor, and the judge made no further mention of the attentiveness of this juror.

stab wounds to the victim's body and the effect of decomposition were unnecessarily gruesome and prejudicial. "The question whether the inflammatory quality of a photograph outweighs its probative value and precludes its admission is determined in the sound discretion of the trial judge." Commonwealth v. Amran, 471 Mass. 354, 358 (2015), quoting Commonwealth v. Pena, 455 Mass. 1, 12 (2009). We defer to the judge's exercise of discretion unless the judge has made "'a clear error of judgment in weighing' the factors relevant to the decision, . . . such that the decision falls outside the range of reasonable alternatives" (citations omitted). L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

Recognizing the heightened risk of prejudice from autopsy photographs depicting a body in a state of decomposition, we have cautioned that such photographs should be admitted only if the judge determines that "they are important to the resolution of any contested fact in the case." Commonwealth v. Bastarache, 382 Mass. 86, 106 (1980). Here the autopsy photographs depicting the thirteen stab wounds to the victim's body in a state of decomposition and the location of the body at the crime scene were indisputably probative of extreme atrocity or cruelty and premeditation, the theories of murder on which the defendant was tried. It is settled law "that photographs indicating the force applied and portraying the injuries inflicted may properly

be admitted on the issue of whether the murder was committed with extreme atrocity or cruelty, as well as on the issue of premeditation and deliberation." Commonwealth v. Meinholz, 420 Mass. 633, 635 (1995), and cases cited. In considering the theory of extreme atrocity or cruelty, the jury would be required to consider the factors listed in Commonwealth v. Cunneen, 389 Mass. 216, 227 (1983). Of those factors, the autopsy photographs are probative of: "consciousness and degree of suffering of the victim, extent of physical injuries, number of blows, manner and force with which delivered, instrument employed, and disproportion between the means needed to cause death and those employed." Id. The photograph depicting the victim's body surrounded by trash bags was relevant to concealment and, thus, to the defendant's consciousness of guilt. The photographs depicting the advanced state of decomposition of the victim's body were relevant to the time of death which, based on reasonable inferences, could have occurred several days before the body was found and before the defendant fled to Mexico. See Commonwealth v. Nadworny, 396 Mass. 342, 366-367 (1985), cert. denied, 477 U.S. 904 (1986).

The judge properly weighed the probative value of the photographs against the prejudice to the defendant. Because photographs that depict a decomposing body may be more inflammatory, "special caution" is warranted in the admission of

such photographs.  Commonwealth v. Cardarelli, 433 Mass. 427, 431 (2001).  Having determined that the photographs were "important to the resolution of . . . contested fact[s] in the case," Bastarache, 382 Mass. at 106, the judge appropriately determined that the prejudice could be acceptably mitigated and did so.

A judge may mitigate prejudice in several ways:  "alerting the venire during jury selection that graphic photographs might be admitted in evidence, and [asking] potential jurors if that might cause anyone particular difficulty"; limiting the number of photographs admitted; prohibiting the Commonwealth from displaying the photographs on a high-resolution video screen; and instructing the jury that they should not be swayed by emotion by the introduction of the photographs.  Amran, supra at 358.  In the exercise of discretion in handling the admission of autopsy photographs, a judge is not required to take all of these steps.  See, e.g., Commonwealth v. Vizcarrondo, 431 Mass. 360, 362-363 & n.2 (2000), S.C., 447 Mass. 1017 (2006) (voir dire questioning and contemporaneous instructions "appropriate precautionary steps" for introduction of photographs showing victim's injuries); Commonwealth v. Jackson, 428 Mass. 455, 465 (1998) (absence of limiting instruction not "sufficient to render the admission of the photographs error"); Nadworny, 396 Mass. at 366-367 (no abuse of discretion where judge "diligently

reviewed the photographs, eliminating one as redundant," and gave limiting instruction regarding depictions of "badly decomposed body of the deceased in the fetal position in which it had been bound").  We need only determine that steps taken by the judge sufficiently mitigated the prejudice.  Jackson, 428 Mass. at 465 (mitigating factors "considered in determining whether the photographs were more prejudicial than probative").

Here, the judge questioned the venire during voir dire to weed out those jurors who would have difficulty in remaining impartial after viewing the graphic autopsy photographs.  The judge also carefully reviewed the twenty autopsy photographs submitted by the prosecutor, out of the more than 300 photographs that were available, and he winnowed the number to eighteen, each of which was probative of a point that the others were not.  During final instructions, the judge explained that the jury were not "to let [their] verdicts be influenced in any way by the fact that the photos were graphic."[10]  These steps sufficiently mitigated the prejudice inherent in use of such evidence.

---

[10] The judge mistakenly stated that he had given a limiting instruction on this issue during the trial.  However, he had not done so.  The only prior time that the judge mentioned the photographs to the jury was during the voir dire when he alerted the venire that the written questionnaire would ask whether viewing "graphic and unpleasant" photographs would affect the juror's ability to be fair and impartial.

The defendant challenges the omission of a contemporaneous limiting instruction, which he failed to request when his objection to the admission of the photographs was overruled. Although it may have been better practice to give a limiting instruction before the photographs were introduced, the judge did not abuse his discretion in handling the autopsy photographs. Jackson, 428 Mass. at 465 ("absence of [concurrent limiting] instruction is not, by itself, sufficient to render the admission of the photographs error").

b. Prejudicial statements. The defendant argues that certain of his statements were erroneously admitted at trial because they were irrelevant and unfairly prejudicial. As the defendant did not object, we review to determine whether any error caused a substantial likelihood of a miscarriage of justice. Commonwealth v. Wright, 411 Mass. 678, 681 (1992), S.C., 469 Mass. 447 (2014).

First, the defendant told the arresting officers, "I've never been so happy to be arrested in my whole life." The defendant argues that reference to the prior arrest improperly suggests a propensity for criminal behavior. This statement, together with the defendant's follow up that "Mexico is a fucked-up place," was relevant to why the defendant was crossing back into the United States from Mexico when he was arrested. Moreover, the jury were not likely to focus on any implication

of prior arrests where some of the defendant's prior convictions were introduced during his testimony.

Second, the defendant challenges the admission of a statement in which he questioned the police officers accompanying him on the return trip to Massachusetts about whether the media were comparing him to a man who had shot his wife and infant and then fled the country. He argued that the reference was highly prejudicial because the jurors may have been aware that the defendant in that case had been convicted of murder and viewed the two cases as similar.[11] The defendant's comparison to another murder may not have been particularly relevant, but it did not create a substantial likelihood of a miscarriage of justice in light of the strong case against the defendant.

Third, the defendant claims error in the admission of a statement to police that he and the victim had been "together" since she was fourteen years of age, arguing that reference to the victim's age indicated the prior bad act of a sexual relationship with a minor. There was no error in admitting the statement referencing the victim's age when she and the defendant were first "together." In the circumstances of this case, "the jury were entitled to evidence describing the whole

_____

[11] See Commonwealth v. Entwistle, 463 Mass. 205, 206 (2012), cert. denied, 133 S. Ct. 945 (2013).

relationship."  Commonwealth v. Robertson, 408 Mass. 747, 751 (1990).

     c.  Victim's purse.  The defendant argues that trial counsel was ineffective for failing to file a motion to suppress the victim's purse, wallet, and identification that were found in the defendant's hotel room on August 6, when police performed a well-being check on the defendant's daughter.[12]  The officer who found the items testified that there "were several grocery bags" in the defendant's hotel room.  In one of the bags, he "noticed a large gallon of vodka" and a female's purse.  The purse "was in plain view in the bag as [he] looked in."  The defendant consented to the officer's request to "look" at the purse.  The officer found a wallet containing two items of identification with the victim's name on them, and he put them back in the purse after looking at them.

---

     [12] The evidence was not seized nor was it contained in the police report from that incident.  The evidence was, however, mentioned in the probable cause affidavit supporting the warrant application to search the defendant's apartment.  Three days before trial, the prosecutor notified defense counsel that the defendant had made a statement to police during the well-being check about the identification belonging to the victim and that the purse was just with the baby's things when he picked them up.  During trial, counsel filed a motion to exclude the evidence and statement, arguing that he had not been properly notified.  The judge denied the motion after concluding that the issue was waived because relevant information was contained in the probable cause affidavit.  Trial counsel moved for a mistrial after this ruling, arguing that he would have been ineffective for not raising the issue earlier.  The judge responded that "'ineffective' is not a word that comes to mind in my observations of you."

The defendant challenges the consent to search the purse, arguing that his intoxication and the coercive environment negated the voluntariness of any consent he may have given.  The defendant contends that this evidence created a substantial likelihood of a miscarriage of justice because the possession of the purse and its contents suggested a consciousness of guilt and the prior bad act of stealing from a deceased person.

"The question whether consent was voluntary is a question of fact to be determined in the circumstances of each case, with the burden of proof on the government."  Commonwealth v. Carr, 458 Mass. 295, 302 (2010), quoting Commonwealth v. Aguiar, 370 Mass. 490, 496 (1976).  "An otherwise voluntary act is not necessarily rendered involuntary simply because an individual has been drinking or using drugs."  Commonwealth v. Silanskas, 433 Mass. 678, 685 (2001), quoting Commonwealth v. Shipps, 399 Mass. 820, 826 (1987), S.C., 472 Mass. 1001 (2015).

The defendant's claim is unavailing.  One of the responding officers described the defendant as "somewhat intoxicated, calm, cooperative."  Another testified that the defendant was able to understand and respond to his questions, and that he was able to properly change his daughter's diaper at the officer's request. An investigator with the Department of Children and Families testified that the defendant was "able to converse with [her] without any problem."  Because a motion to suppress on this

ground likely would not have succeeded, counsel was not ineffective. Commonwealth v. Comita, 441 Mass. 86, 91 (2004). The evidence clearly demonstrates that the defendant was not too intoxicated to give consent and there was no evidence of coercion.

3. Jury instructions. a. Unrecorded interview. The police interview on the evening of August 16, 2010, at the Framingham police station was unrecorded after the defendant stated "pretty emphatically that he did not want to be recorded" and signed a form acknowledging that he understood and waived his Miranda rights and that he "d[id] not want [their] discussion recorded." The form was admitted at trial. At the defendant's request, the judge gave instructions before the defendant's statements were introduced and during the final charge in accordance with DiGiambattista, 442 Mass. at 447-448,[13]

---

[13] After Commonwealth v. DiGiambattista, 442 Mass. 423, 447-448 (2004), we required, "when the prosecution introduces evidence of a defendant's confession or statement that is the product of a custodial interrogation or an interrogation conducted at a place of detention (e.g., a police station), and there is not at least an audiotape recording of the complete interrogation" and the defendant requests, that judges provide a jury instruction advising that:

"the State's highest court has expressed a preference that such interrogations be recorded whenever practicable, and cautioning the jury that, because of the absence of any recording of the interrogation in the case before them, they should weigh evidence of the defendant's alleged statement with great caution and care. Where voluntariness is a live issue and the humane practice instruction is

which alerted the jury that they should consider the credibility of the evidence with "great caution" and permitted the jury to conclude that the statements were not made voluntarily because the interview was unrecorded.  The judge added that the defendant has the "right" to refuse the recording.[14]  The defendant objected to the added language, asserting that there is "no right of a defendant to reject the recording."  The judge explained to counsel that his intention was to protect the defendant from his refusal "reflect[ing] badly on him" and that he thought the additional language was correct.

The defendant argues that the judge erred in instructing the jury that the defendant had a "right to decline" recording of his custodial interrogation because DiGiambattista created no such right, only an obligation of the police to record the statement.  He further argues that we should require that all interrogations be recorded or subject to an exclusionary rule. We conclude that neither argument has merit.

---

given, the jury should also be advised that the absence of a recording permits (but does not compel) them to conclude that the Commonwealth has failed to prove voluntariness beyond a reasonable doubt."

[14] The judge's contemporaneous instruction included the following elaboration:  "I should say at this point that it was [the defendant's] right to decline the recording.  That's why the form is there.  That's why he was asked the question.  So, that's just the way it is.  But the lack of a recording has those implications for you."

The DiGiambattista instruction "is required even when a defendant has refused a recording of his custodial interrogation." Commonwealth v. Rousseau, 465 Mass. 372, 392 (2013). In Rousseau, supra at 391, as in this case, the defendant elected not to have his interview recorded orally by "initialing his refusal on his Miranda waiver form."[15] We approved language instructing the jury that they could consider "whether the defendant was given an opportunity to have his interrogation recorded, and whether the defendant voluntarily elected not to have his interrogation recorded." Id. at 393. Although in Rousseau, supra at 392, we cautioned against advising juries that defendants have "waived" the decision to have their interrogations recorded because waiver is a question of fact, the "gist of the judge's additional language" was not problematic in terms of the rule we adopted in Rousseau. We now add that the better practice is not to instruct juries that defendants have a "right" to refuse recording. Permission to record an interview is not required so long as the interviewee has actual knowledge of the recording. See Commonwealth v. Boyarsky, 452 Mass. 700, 705 (2008), citing Commonwealth v. Jackson, 370 Mass. 502, 507 (1976) ("A recording that is made

_____

[15] In Commonwealth v. Rousseau, 465 Mass. 372, 392 (2013), the police recorded the defendant's decision not to have the interview recorded, and the audio recording was played for the jury. We recommend following this practice where a suspect refuses to have his or her interview recorded.

with the actual knowledge of all parties is not an interception, even if they have not affirmatively authorized or consented to it"). Cf. G. L. c. 272, § 99 (B) (4), (C) (1) (prohibiting secret recordings).

In any event, the defendant is not entitled to relief because the judge's instructions satisfied the intent of the DiGiambattista instruction as interpreted in Rousseau. The judge gave the instruction before we proposed specific language in Rousseau, and we again recommend the language in Rousseau for similar circumstances. In addition, as we have said before, a "judge need not use any particular words in instructing the jury as long as the legal concepts are properly described." Commonwealth v. Robinson, 449 Mass. 1, 8 (2007), citing Commonwealth v. Torres, 420 Mass. 479, 484 (1995).

In connection with this argument, the defendant challenges the police practice of advising suspects that he or she has the "right" to decline recording. In this case, the police used a form that advised the defendant that he had a choice whether or not to have his interview recorded and asked him to initial his name next to his choice and sign the form.[16] As discussed, the police need only provide notification of a recording; permission to record is implied by any statements made after such

_____

[16] The amici advise that various versions of this form are used by police departments in the Commonwealth.

notification.  Accordingly, the better practice going forward is simply to advise suspects of the recording instead of requesting permission to record.[17]  A suspect's refusal to be recorded, however, does not cause unrecorded statements to be inadmissible.[18]

Last, we have declined requests to adopt an exclusionary rule in DiGiambattista and in subsequent cases.  See, e.g., Commonwealth v. McCowen, 458 Mass. 461, 472 n.9 (2010).  The defendant has offered no persuasive reason to change course, especially where his refusal to allow recording would likely be an exception to any such rule.  DiGiambattista, 442 Mass. at 445.

b.  Extreme atrocity or cruelty.  The defendant challenges the judge's instructions on murder in the first degree committed with extreme atrocity or cruelty, arguing that the Commonwealth should be required to prove that a defendant intended that the victim suffer greatly or was indifferent to such suffering and

---

[17] Although there was no error in the police officer's use of the form, we recommend going forward that police, instead of requesting permission to record, advise that the interview is being recorded.

[18] Regardless, the defendant suffered no prejudice where the statements he made during this interview added little to the strong case against him.  Specifically, a State trooper who conducted the interview testified that the defendant denied killing his wife, described their marriage, and said that he was not surprised by the result of the deoxyribonucleic acid test.

the instructions should reflect that element of proof.[19]  As a
threshold matter, the judge's instructions were consistent with
the model instruction in effect at the time of trial.  Model
Jury Instructions on Homicide 11-14 (1999).  We have declined a
similar request to modify the current law in Massachusetts, and
we decline to do so here.  See, e.g., Commonwealth v. Boucher,
474 Mass. 1, 8 (2016) (reiterating that convictions of murder on
theory of extreme atrocity or cruelty do not require intent
"beyond the requirement of malice needed for all convictions of
murder").  Even were we inclined to make such a change, this
would not be an appropriate case to do so where the defendant's
actions, including inflicting thirteen separate stab wounds,
satisfies the very instruction he is requesting.

4.  Relief pursuant to G. L. c. 278, § 33E.  We have
examined the record pursuant to our duty under G. L. c. 278,
§ 33E, and we discern no basis on which to grant the defendant
relief.

Judgments affirmed.

---

[19] The defendant does not appear to have requested this jury
instruction, but he objected to the applicable portion of the
instructions before and after they were given.