NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13369


COMMONWEALTH  vs.  FRANKLIN CONZA.



Hampden.     February 6, 2026. – May 5, 2026.

Present:  Budd, C.J., Kafker, Wendlandt, Georges, & Dewar, JJ.


Homicide.  Mental Health.  Criminal Responsibility.  Practice,
     Criminal, Jury and jurors, Argument by prosecutor,
     Voluntariness of statement, Motion to suppress, Capital
     case.  Evidence, Bias, Argument by prosecutor, Expert
     opinion, Inference, Photograph, Relevancy and materiality,
     Voluntariness of statement.  Jury and Jurors.  Witness,
     Expert.  Constitutional Law, Voluntariness of statement.



     Indictment found and returned in the Superior Court
Department on August 2, 2018.

     A pretrial motion to suppress evidence was heard by Edward
J. McDonough, Jr., J., and the case was tried before him.


     William S. Smith for the defendant.
     Travis H. Lynch, Assistant District Attorney, for the
Commonwealth.


     WENDLANDT, J.  After a jury trial, the defendant, Franklin

Conza, was found guilty of murder in the first degree on a

theory of deliberate premeditation for the stabbing death of the

victim, Carlos Santos. The defendant's primary defense at trial was lack of criminal responsibility.

In this direct appeal, the defendant contends that he is entitled to a new trial because the trial judge seated a biased juror over the parties' objections, the prosecutor made improper statements in closing argument, the judge abused his discretion in admitting autopsy photographs of the victim, and the judge erred in denying the defendant's pretrial motion to suppress certain statements. The defendant also asks us to exercise our authority under G. L. c. 278, § 33E, to order a new trial or a reduction in the verdict. We affirm the defendant's conviction of murder in the first degree and discern no reason to grant relief under G. L. c. 278, § 33E.

1. <u>Background</u>. a. <u>Facts</u>. We summarize the facts the jury reasonably could have found, reserving certain details for later discussion.

i. <u>Defendant's employment</u>. The defendant had been employed at a bakery in Ludlow for about eighteen years. The bakery was owned by the victim and his brother. The defendant usually worked the evening shift beginning at 5 <u>P</u>.<u>M</u>. and generally ending between 10 <u>P</u>.<u>M</u>. and midnight, although he was known to stay late if needed.

ii. <u>Events leading to the stabbing</u>. In the two weeks prior to the stabbing, the defendant argued with each of the

owners of the bakery.  He argued with the victim two weeks prior to the stabbing, although the details of the argument were not in evidence.  One week prior to the stabbing, the defendant argued with the victim's brother after the brother asked the defendant and another employee, Joaquim Pereira, to stay late.  The defendant worked every night during the week of the victim's stabbing.

iii.  The stabbing.  On May 18, 2018, the defendant arrived at the bakery at approximately 4:30 P.M.  Liliana Rodrigues, a bakery employee who saw the defendant when he arrived, did not notice anything unusual in the defendant's demeanor.  He was not mumbling, speaking to himself, or cursing, and the defendant did not appear to be disoriented.

Pereira arrived for his shift between 4:45 P.M. and 5:10 P.M.  When Pereira arrived, he saw the defendant preparing dough; like Rodrigues, Pereira did not notice anything unusual about the defendant's demeanor.  The defendant appeared to be concentrating on his work and was not mumbling or laughing to himself.  Sometime after Pereira's arrival, the defendant instructed him to work on the donuts, which were prepared in a back corner of the bakery separated from the bakery floor by the basement stairs.

Fifteen to twenty minutes later, Pereira witnessed the defendant stabbing the victim near the employee entrance to the

bakery.  The stabbing was also captured on surveillance video footage, which showed the defendant see the victim, put down the instrument he was using to prepare bread, run around a large bin, select a knife, and repeatedly stab the victim.

The defendant ignored Pereira's pleas to stop, and when the defendant's back was turned, Pereira grabbed the defendant from behind, pinning the defendant against a machine as the defendant struggled to break free.  The victim, clutching his bloody chest, stumbled out of the employee entrance and into the parking lot, eventually collapsing onto the ground.

The medical examiner who conducted the victim's autopsy concluded that the victim died from complications from a sharp force injury to the left shoulder that transected the subclavian/axillary artery and punctured the left lung.

iv.  The arrest.  Responding to a 911 call, Ludlow Police Officer Daniel Soares and a second officer arrived at the bakery at around 6:51 P.M.; they found the victim lying motionless in a pool of blood.

Entering the bakery, they saw Pereira restraining the defendant.  Soares instructed Pereira to release the defendant. Upon being released, the defendant continued to be combative and tried to evade capture, ignoring the officers' orders.  During the ensuing struggle, the defendant, who spoke Spanish, stated,

"[K]ill me, kill me, kill me." Eventually, the officers were able to restrain the defendant.

Once the defendant was handcuffed and brought to his feet, he was calm and cooperative; he did not appear to be dazed or confused. As the officers escorted the defendant past the victim's body and toward the police cruiser, the defendant turned to the victim and said, "[F]ucking bitch."

Soon afterwards, Ludlow Police Chief Pablo Madera arrived at the bakery. Madera advised the defendant in Spanish that he was under arrest for assault and battery by means of a dangerous weapon.[1] The defendant responded to the statement by asking, "I'm under arrest?" to which Madera said, "[Y]es." The defendant then said, "I understand," and after a pause, "I stabbed the owner." Madera informed the defendant of his Miranda rights in Spanish.

Before leaving for the police station, the defendant asked the officers to go back into the bakery to retrieve a few of his personal items -- a wallet, clothing, and identification. During the conversation with Madera and on the ride to the police station, the defendant was calm, cooperative, and coherent; the defendant did not laugh or talk to himself.

---

[1] At the time, the victim had not yet been declared dead.

The booking video footage, which was shown to the jury, showed that the defendant also was calm and cooperative throughout the booking process. The defendant provided coherent responses, correctly identifying personal information such as his date of birth, Social Security number, and marital status.

After the booking process was complete, the defendant was taken to Mercy Medical Center, where he received care for his nose, which had been injured as officers tried to subdue him at the bakery. The police officer who accompanied him to the hospital did not observe the defendant engage in any unusual behaviors; as he had during the booking process, the defendant coherently responded to all questions.

During his admission to the Hampden County Correctional Center several hours after the stabbing, staff clinicians similarly reported nothing unusual about the defendant's behavior. They concluded that the defendant was not experiencing a mental health crisis warranting commitment at a mental health facility or the evaluation and stabilization unit within the jail.

v. <u>Criminal responsibility</u>. The defense at trial was lack of criminal responsibility. The defendant has a history of psychiatric afflictions and hospitalizations. The defendant's ex-wife testified that during the course of their relationship from about 2004 to 2016, the defendant "[s]ometimes" was

"normal, but then sometimes he was strange."  The ex-wife testified that the defendant would sometimes suffer from insomnia, experience delusions, and hear voices in his head.  The ex-wife also testified that the defendant was sometimes able to recognize when his symptoms were acute and would ask for assistance in obtaining care.

Between 2006 and 2016, the defendant was hospitalized on four occasions for periods of eight to eleven days due to mental illness.  During each hospitalization, the defendant was diagnosed with major depression with psychotic features or psychosis and prescribed antipsychotic medication.  The defendant voluntarily committed himself on three of the four occasions.  Specifically, in 2006, the defendant asked to be driven to the Baystate Medical Center to receive treatment; he was diagnosed with major depression with psychosis, alcohol abuse, and cocaine abuse, and was hospitalized for eleven days in the adult psychiatric treatment unit.  The defendant's records indicate that he was hypervigilant, guarded, and depressed, and had disorganized thinking.

In 2007, the defendant walked himself to the emergency room of Baystate Medical Center; he was diagnosed with recurrent and severe major depression with psychotic features and hospitalized for eight days in the adult psychiatric treatment unit.  The

defendant's records indicate that he was expressing paranoid thoughts and had a depressed affect, but was otherwise oriented.

In 2008, the defendant was admitted to a behavioral hospital in Holyoke after police found him lying on train tracks under the wheels of a train; he was diagnosed with psychosis and hospitalized for eight days.  The defendant's records show that upon admission to the hospital, he was disoriented, laughing, responding to internal stimuli, and unable to answer open-ended questions.

Last, in 2016, the defendant called a taxicab to Baystate Medical Center to receive treatment after his symptoms made it difficult for him to concentrate at work; he was diagnosed with recurrent and severe major depressive disorder with psychotic features and hospitalized in the adult psychiatric treatment unit for nine days.  The defendant's records indicate that he was expressing paranoid thoughts, but was calm and cooperative and had linear, coherent thinking.

Generally, when the defendant was taking his medication, his symptoms were under control.[2]  Before the stabbing, the

---

[2] The record at trial was unclear whether the defendant was taking the antipsychotic medication at the time of the incident. The defendant last filled a thirty-day supply of his prescription in February 2018, which suggested that the medication would have been exhausted in March 2018 if the defendant had taken it as directed.  During the week prior to the stabbing, Pereira observed the defendant muttering and cursing to himself on several occasions.

defendant had not committed an act of violence against another person due to mental illness.

The defendant's expert, Dr. Michael Sherry, opined that the defendant was not criminally responsible because he was suffering from the symptoms of mental illness at the time of the offense, which included a delusion that the victim and others were conspiring to cut off his cellular telephone service in order to sever his ties to his family and encourage a relationship with the victim's daughter.

In the course of formulating his opinion, Sherry met with the defendant twenty-two times. Sherry also met with the defendant two additional times after formulating his opinion.

During the first postevaluation meeting, the defendant denied stabbing the victim due to the victim's involvement in a plot to cut off his cellular telephone service; instead, the defendant stated that he was angry at the victim for working him too hard and stabbed him in a moment of blind rage. Sherry did not alter his opinion in light of the defendant's disclosures.

Following that meeting, however, Sherry met with the defendant once more, administering an intelligence test to determine whether the defendant had the intellectual capacity to fabricate the complex delusions he had reported in earlier meetings. Sherry concluded that the defendant was a person of borderline intellect, and fabricating the "complicated" delusion

that the defendant had reported to Sherry during the course of the twenty-two meetings "would require a lot of intellect."

By contrast, the Commonwealth's expert, Dr. Fabian Saleh, opined that the defendant was criminally responsible for the stabbing. Saleh explained that although the defendant sometimes suffered from delusions, he was not symptomatic at the time of the offense. Saleh relied on, inter alia, the statements that the defendant made during his interview with Saleh that he was angry with the victim for making him work long hours, generally felt abused by the victim, and was specifically agitated on the day of the stabbing because he had worked a lot and received minimal assistance.

Saleh also explained the flaws in Sherry's methodology, stating that excessive meetings with a person to perform a forensic evaluation risk the creation of a bond between the evaluator and the person, thereby jeopardizing the evaluator's objectivity. Saleh also testified that once a forensic evaluator formulates an opinion on a person's criminal responsibility, the evaluator generally should not continue meeting with the individual as Sherry had.

b. Procedural history. In August 2018, the defendant was indicted by a Hampden County grand jury on charges of murder in the first degree, G. L. c. 265, § 1, and assault on a person sixty years or older by means of a dangerous weapon, G. L.

c. 265, § 15B (a).[3]  Following a jury trial, the defendant was convicted of murder in the first degree on the theory of deliberate premeditation; the jury rejected the theory of extreme atrocity or cruelty.  The jury also found the defendant not guilty of the assault charge.  The defendant timely appealed from his conviction.

2.  Discussion.  On appeal, the defendant argues that the judge erred in seating a biased juror; the prosecutor made improper statements in closing argument; the judge abused his discretion in admitting autopsy photographs; and the judge erred in denying the defendant's pretrial motion to suppress.  We address the defendant's contentions in turn.

a.  Biased juror.  We need not dwell long on the defendant's argument regarding the challenged juror.  While the inclusion of a biased juror in deliberations is structural error requiring reversal, see Commonwealth v. Grier, 490 Mass. 455, 464 (2022), the challenged juror in the present case was selected as an alternate and did not participate in deliberations.  Thus, the juror's alleged bias did not influence

---

[3] The alleged victim of the assault on a person sixty years or older by means of a dangerous weapon in violation of G. L. c. 265, § 15B (a), was Pereira, who was sixty-four years old at the time of the stabbing incident.

the verdict, and the defendant suffered no prejudice.[4]  See

Commonwealth v. Smith, 461 Mass. 438, 443 (2012) (prejudice

shown only "where the challenged juror actually deliberates in a

case"); id. (declining to consider propriety of disallowance of

defendant's peremptory challenge where challenged juror did not

deliberate); Commonwealth v. Bockman, 442 Mass. 757, 763-764

(2004) (once improperly seated juror was removed, "there was no

juror on the panel against whom the defendant could claim

suspected or perceived bias" and therefore defendant suffered no

prejudice).

b.  Closing argument.  The defendant next contends that the

prosecutor made several improper statements during closing

argument that individually and cumulatively require reversal.

We review the challenged arguments "in the context of the entire

closing, the jury instructions, and the evidence introduced at

trial" (citation omitted).  Commonwealth v. Wilkerson, 486 Mass.

159, 180 (2020).  Because "there was no objection to the

---

[4] The defendant does not contend, and there is nothing in
the record to suggest, that the challenged juror engaged in any
premature deliberations or otherwise influenced the deliberating
jury.  The judge instructed the jurors not to discuss the case
with anyone and asked the jurors each morning of trial whether
they had any difficulty following that instruction the previous
day; the jurors never reported any communications with the
allegedly biased juror.  See Commonwealth v. Andrade, 468 Mass.
543, 549 (2014) ("The jury are presumed to follow the judge's
instructions").

prosecutor's closing argument, we review the challenged statements for error and, if they constitute error, for a substantial likelihood of a miscarriage of justice." Commonwealth v. Kapaia, 490 Mass. 787, 801 (2022).

i. Defense's expert. The defendant challenges the prosecutor's statements (1) that Sherry "completely ignore[d] everything in this case:  the records, the witnesses to the offense, witnesses who came into contact with the defendant immediately after the murder, and the murder itself"; (2) that "the defense expert was the defendant's advocate, not his evaluator"; and (3) that the defendant was Sherry's "client[]."[5]

---

[5] Specifically, the prosecutor stated in closing:

"And I submit that there is no evidence in this case that this defendant was suffering from a mental health defect at the time of the crime.

"But that certainly didn't stop Dr. Sherry from forming an opinion about the defendant's mental state at the time he stabbed Carlos Santos. All he had to do was completely ignore everything in this case:  the records, the witnesses to the offense, witnesses who came into contact with the defendant immediately after the murder, and the murder itself.  It's just that easy.

"And I submit that this is because the defense expert was the defendant's advocate, not his evaluator. . . .  [Dr. Sherry] placed little weight to the jail records on the defendant's intake and did not really address those records that showed he was not psychotic, but he certainly had no problem crediting those records when it showed him something that could help his client's case on 6/18, when Franklin Conza started to complain about his symptoms. . . .  And this doctor wasn't going to consider a viewpoint that was contrary to what his client's was. . . .  Ladies

It is improper for a prosecutor to suggest that an expert witness's testimony was "bought" or to characterize a witness as a "hired gun" or "mercenary soldier," as such arguments, absent any basis in the evidence, impermissibly play on the prejudices of the jurors and "make it less likely that the jury will return a verdict based on fair, calm consideration of the evidence." Commonwealth v. Shelley, 374 Mass. 466, 469-471 (1978), S.C., 381 Mass. 340 (1980) and 411 Mass. 692 (1992) (prosecutor's insinuation that expert witnesses were "bought" and "mercenary soldiers" was improper, as there were no facts in evidence that witnesses received more than their usual fees and statements impermissibly played on jurors' prejudices). Such improper statements may amount to reversible error, especially where they go "to the very heart of the case" and strike "impermissibly . . . at the defendant's sole defense." Id. at 471.

Nonetheless, a prosecutor permissibly may suggest bias on the part of an expert by arguing that "that the expert[] . . . ignor[ed] evidence that would undercut [his or her] opinion[]" if the suggestion is supported by the evidence. Commonwealth v. Lacrosse, 494 Mass. 475, 504-505 (2024). See Commonwealth v.

---

and gentlemen, Dr. Sherry only looked back and looked away from the evidence of this case. And I submit to you that is the goal of the defense argument at trial. . . . Dr. Sherry was an advocate, not an evaluator." (Emphases added.)

Rutherford, 476 Mass. 639, 644 (2017) (no error where prosecution stated in closing "that the expert witness failed to consider 'the facts [that] really count'" as "[c]omments directed at the reliability of an expert's opinion do not exceed the bounds of permissible argument").  Where remarks are "limited to discussion of the evidence presented and the reasonable inferences that can be drawn from that evidence," they are proper.  Commonwealth v. Rakes, 478 Mass. 22, 45 (2017).  Within such bounds, "[e]xcusable hyperbole . . . is acceptable," as jurors are assumed to "have a certain measure of sophistication in sorting out excessive claims on both sides." Commonwealth v. Da Lin Huang, 489 Mass. 162, 181 (2022), quoting Commonwealth v. Wilson, 427 Mass. 336, 350 (1998).

Here, the prosecutor's remarks were proper, as they were grounded in evidence and the reasonable inferences that could be drawn therefrom.  First, while it was hyperbole that Sherry "completely ignore[d] everything in this case," the evidence showed that Sherry discounted evidence suggesting that the defendant was not suffering from delusions from his mental illness on the day of the murder.  Sherry did not consider the defendant's booking video footage and medical records from the evening of his arrest that indicated that the defendant was calm and alert.  Sherry also did not interview the bakery workers who interacted with the defendant immediately prior to and during

the stabbing; these witnesses testified that the defendant was coherent and not exhibiting any symptoms in the moments before the killing.  Similarly, Sherry did not talk to the police officers who interacted with the defendant immediately afterwards; these officers reported that the defendant was calm, rational, and coherent after the arrest.  Further, Sherry did not factor into his opinion the surveillance footage of the murder itself, which showed the defendant, upon seeing the victim, leave his station, maneuver around a bin, select a knife, and repeatedly stab the victim.  Indeed, following the remarks that the defendant contends were improper, the prosecutor specifically listed the evidence to which Sherry himself testified he gave little weight in forming his opinion.[6] See Grier, 490 Mass. at 472 ("where a prosecutor's language is 'based in fact' . . . , emotive language in a prosecutor's closing argument is permissible as merely 'enthusiastic rhetoric, strong advocacy, and excusable hyperbole'" [citation omitted]).

---

[6] Specifically, in closing the prosecutor highlighted that Sherry did not interview Soares, Madera, or Rodrigues; gave little weight to the medical records and jail intake evaluation from the night of the stabbing indicating that the defendant was alert, calm, and oriented; and did not draw any conclusions from the surveillance video footage of the stabbing, which showed the stabbing and the defendant regaining his composure after he was placed under arrest.

Second, the evidence supported the inference that Sherry's objectivity was compromised and that he viewed the defendant as a client on whose behalf he was to advocate. Sherry himself referred to the defendant as his "client," stated that he was "working for the defense," and explained that he sought to establish a "rapport" with the defendant "so that he would see [Sherry] as a neutral party even though [Sherry was] working for him and for the defense."

Saleh stressed the importance of not becoming an advocate during a forensic evaluation and explained the risks of bias that may arise when a forensic evaluator repeatedly meets with a person. Specifically, Saleh testified that repeated contact could taint the evaluation, as the person may begin to view the evaluator as a treating doctor, and the evaluator can assume that role, impairing objectivity. Accordingly, Saleh testified that it was highly unusual for a forensic evaluator to meet with an individual twenty-two times, which is precisely what Sherry had done; Saleh also testified that it was inappropriate for a forensic evaluator to continue visiting the defendant after completing his report on criminal responsibility -- again, precisely what Sherry had done -- given the limited scope of the role of a forensic evaluator.

Moreover, the evidence showed that some of Sherry's conclusions were contradicted by other evidence that was

available to him. For example, Sherry noted that the defendant had trouble recognizing the reality that he was divorced. However, the booking video footage, which Sherry testified that he viewed, showed the defendant correctly identifying his marital status as divorced in the hours after the stabbing. More significantly, during one of Sherry's postevaluation meetings with the defendant, the defendant admitted to having killed the victim because he was angry at the victim for overworking him. Yet Sherry did not account fully for this admission, which contravened his opinion. In sum, the challenged remarks, although they concerned a central issue at trial, were proper, as they urged the jury to draw reasonable inferences based on the evidence.

   ii. <u>Statement about victim's injuries</u>. The defendant additionally challenges the following statement made by the prosecutor while referring to the surveillance footage of the stabbing as impermissibly playing upon the jurors' sympathies:

> "And I submit that it is ridiculous to think that a stabbing causes an endorphin rush. Defense would have you believe it's as good as a runner's high. Did defendant --

> "Did Carlos Santos look like he was experiencing a rush of euphoria? Absolutely not."

This statement was made in response to the defendant's suggestion during cross-examination of the medical examiner[7] and in closing argument that the victim did not suffer, in part, because his body released endorphins in response to being stabbed. In closing, defense counsel stated:

> "You also heard that a body subjected to trauma will produce endorphins, a hormone which reduces the sensation of pain. . . . This is tough evidence to consider, but you should consider this evidence that [the victim] did not appear to have suffered in your consideration of the charge of murder by extreme atrocity or cruelty."

The prosecutor's statement, which directly responded to the defense argument, was not improper.[8] See Da Lin Huang, 489 Mass.

---

[7] Specifically, on cross-examination, defense counsel had the following exchange with the medical examiner:

Q.: "Okay. And the body has responses to trauma, does it not?"

A.: "It does."

Q.: "Okay. And one of those responses would be the release of endorphins."

A.: "Generally, yes."

Q.: "And that takes place pretty much immediately."

A.: "Within a few seconds likely, yes."

Q.: "Okay. And the release of endorphins helps -- causes someone to feel less pain; isn't that true?"

A.: "That could be part of -- of the mechanism, yes."

[8] Because we conclude that none of the prosecutor's challenged statements individually constitutes error, we also

at 180 ("A 'prosecutor is entitled to make a fair reply to the defendant's closing argument,' and 'may properly comment on the trial tactics of the defen[s]e and on evidence developed or promised by the defen[s]e'" [citations omitted]).

c. Autopsy photographs. The defendant next maintains that the judge abused his discretion in allowing the prosecution to admit autopsy photographs of the victim over the defendant's objection. Specifically, the defendant contends that the judge did not sufficiently weigh the prejudicial impact of the photographs and the stated basis of their admission -- to prove extreme atrocity or cruelty -- against the fact that the defendant's identity as the killer and the victim's cause of death were uncontested.

"The admissibility of photographic evidence is left to the discretion of the trial judge . . . ." Commonwealth v. Waters, 399 Mass. 708, 715 (1987). That the admitted photographs "may be gruesome or have an inflammatory effect on the jury does not render them inadmissible so long as they possess evidentiary value on a material matter." Commonwealth v. Reyes, 483 Mass. 65, 74 (2019), quoting Commonwealth v. Olsen, 452 Mass. 284, 294 (2008). "It is settled law that photographs indicating the

conclude that the statements do not cumulatively warrant reversal.

force applied and portraying the injuries inflicted may properly be admitted on the issue of whether the murder was committed with extreme atrocity or cruelty, as well as on the issue of premeditation and deliberation" (quotation and citation omitted). Commonwealth v. Alleyne, 474 Mass. 771, 779 (2016). Ultimately "[r]elevant evidence is admissible so long as the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice" (citation omitted). Reyes, supra.

Here, the judge expressly weighed the probative value of the photographs on the issue of extreme atrocity or cruelty against their prejudicial effect; he did not admit all the photographs the Commonwealth sought to introduce but instead limited the Commonwealth to one photograph of each significant wound. See Commonwealth v. Tassinari, 466 Mass. 340, 349 (2013) (autopsy photographs not unduly prejudicial where they "comprised a small portion of the exhibits," "each revealed a different way the victim was wounded," and "were relevant to . . . whether the murder was premeditated and committed with extreme atrocity or cruelty"); Commonwealth v. Urrea, 443 Mass. 530, 545 (2005) (no abuse of discretion in admitting autopsy photographs where "each of the eleven autopsy photographs depicted at least one wound that did not appear in any of the

others" and "the one disputed photograph was clearly relevant to the issue of extreme atrocity or cruelty").[9]

d. <u>Motion to suppress</u>. Prior to trial, the defendant moved to suppress statements he had made following the stabbing as involuntary when made in view of his mental health issues. Specifically, he sought to suppress (1) his statement "fucking bitch" directed at the victim as he passed the victim's body while being escorted out of the bakery by officers; (2) his statement, "kill me, kill me, kill me," as he was being restrained; and (3) his statement to Madera that he "killed the owner" of the bakery.[10]  The motion judge, who was also the trial

---

[9] Moreover, the judge mitigated any risk of unfair prejudice by giving a contemporaneous limiting instruction and final charge cautioning the jurors that they may not decide the case based on sympathy for the victim.  See <u>Urrea</u>, 443 Mass. at 545-546 (no abuse of discretion in admitting graphic autopsy photographs where "judge instructed the jury when the photographs were admitted, and again during his final instruction, they were to decide the case unemotionally, dispassionately, and analytically").

[10] Consistent with Massachusetts humane practice, the trial judge resubmitted the issue of voluntariness to the jury, instructing the jurors that they should not consider the defendant's admissions by way of his statement calling the victim "a fucking bitch" and confession that he "stabbed the owner," unless based on all the evidence in the case, they are satisfied beyond a reasonable doubt that the statements were the defendant's free and voluntary act.  See <u>Commonwealth</u> v. <u>Kolenovic</u>, 478 Mass. 189, 198-199 & n.10 (2017) ("If the voluntariness of a confession or admission is a live issue at trial, our 'humane practice' rule requires . . . that the judge instruct the jury" to only consider statement as evidence if prosecution "prove[s] the voluntariness of the statement[] beyond a reasonable doubt").

judge, held evidentiary hearings; Soares, Madera, and Pereira testified. In a thorough decision, the judge denied the motion to suppress, concluding that while the defendant had a history of mental health issues, the prosecution had met its burden to show beyond a reasonable doubt that the challenged statements were voluntary when made. On appeal, the defendant maintains that the judge improperly denied his motion.

"In reviewing the denial of a motion to suppress concerning . . . the voluntariness of a defendant's statements, 'we accept the judge's subsidiary findings of fact absent clear error, give substantial deference to the judge's ultimate findings and conclusions of law, but independently review the correctness of the judge's application of constitutional principles to the facts found.'" Commonwealth v. Estabrook, 496 Mass. 467, 472 (2025), quoting Commonwealth v. Escobar, 493 Mass. 694, 700 (2024). "A statement is presumed voluntary until a defendant produces any evidence showing otherwise." Commonwealth v. Hart, 493 Mass. 130, 135 (2023), S.C., 497 Mass. 1 (2025). "Where such evidence is forthcoming, through a motion and affidavit or a proffer, the presumption disappears, and the Commonwealth then bears the burden of proving beyond a reasonable doubt that the statement was made voluntarily." Commonwealth v. Tremblay, 460 Mass. 199, 206 (2011).

The test for voluntariness is "whether, in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act" (quotation and citation omitted).  Hart, 493 Mass. at 135. A "judge must consider the defendant's physical and mental condition" in assessing voluntariness, as "[s]tatements that are attributable in large measure to a defendant's debilitated condition, such as insanity, . . . are not the product of a rational intellect or free will and are involuntary." Commonwealth v. Allen, 395 Mass. 448, 455 (1985).

Nevertheless, "mental health conditions do not necessarily render a defendant's statements involuntary." Commonwealth v. Roman, 495 Mass. 412, 417 (2025).  See Commonwealth v. Libran, 405 Mass. 634, 638-639 (1989) ("even if the judge accepted as a fact that a defendant was suffering from . . . mental impairment, it does not follow that the judge must rule that the statements were involuntary per se").  "[A] defendant's disturbed . . . mental state does not automatically render his or her statements involuntary" as "[a]n agitated or distressed mental condition . . . could be 'natural for someone who [has] admitted the commission of serious crimes'" (citation omitted). Commonwealth v. Walters, 485 Mass. 271, 281 (2020).

After reviewing the defendant's medical records documenting his history of mental illness, see discussion supra, the judge found that it was "beyond dispute that the defendant has experienced and endured a history [of] mental illness" and that therefore the defendant had made the requisite initial showing. The burden then shifted to the Commonwealth to prove beyond a reasonable doubt that the challenged statements were voluntary. The judge concluded that the Commonwealth had met its burden.

The judge's conclusion was supported by the hearing evidence. For example, Pereira testified that while he had observed the defendant behave erratically and swear at people for no reason on earlier occasions, there was nothing unusual about the defendant's behavior on the day of the stabbing. Soares and Madera similarly testified that the defendant was coherent and cooperative following his arrest, displaying no issues communicating in Spanish. The booking video footage also showed that the defendant provided clear and coherent responses to the questions posed to him. And the medical records from the day of the stabbing similarly noted that he was alert, cooperative, and oriented.

The judge found that the statement "kill me, kill me, kill me" that the defendant made while being restrained was a form of belligerence common in arrest. The judge also found that the statement "fucking bitch" that the defendant made while looking

toward the victim's body as he was escorted out of the bakery was consistent with the circumstances when just minutes earlier he had stabbed the victim multiple times. Further, the judge determined that the defendant's remark "I killed the owner" was a rational response to Madera's confirmation that he was under arrest and illustrated the defendant's understanding of the reason for his arrest.

On this record, the judge did not err in concluding that the Commonwealth had met its burden to show the statements were voluntary. See Walters, 485 Mass. at 280-281 (judge did not err in concluding statements were voluntary where notwithstanding "defendant's emotional distress," defendant provided "coherent narrative of facts" and appeared "ground[ed] in reality"); Commonwealth v. LeBlanc, 433 Mass. 549, 555 (2001) (judge warranted in concluding that defendant's confession was voluntary where although defendant "was emotionally upset, he spoke calmly when giving his statement, and there [was] no evidence that he was acting irrationally"); Commonwealth v. Vazquez, 387 Mass. 96, 100 (1982) ("Although there was evidence that the defendant was suffering from intermittent schizophrenia or toxic psychosis at the time he gave his statements, the judge was not required to allow the motion to suppress" where evidence showed defendant was "calm, coherent, and cooperative" during interrogation [quotations omitted]).

3. Conclusion. After careful review of the entire record, we conclude that there is no reason to exercise our power under G. L. c. 278, § 33E, to order a new trial or reduce the verdict. The defendant's history of mental illness and the issue of his criminal responsibility were squarely before the jury. In these circumstances, "[w]e do not 'sit as a second jury'" and will not "override the jury's determination that the defendant was criminally responsible" (citation omitted). Lacrosse, 494 Mass. at 507. See Commonwealth v. Berry, 466 Mass. 763, 770 (2014); Commonwealth v. Brown, 449 Mass. 747, 773 (2007); Commonwealth v. Lannon, 364 Mass. 480, 486 (1974). We therefore affirm the judgment.

So ordered.